No. 46,968

State of Kansas, *Appellee*, v. Stephen N. Seely, *Appellant.*

(510 P. 2d 115)

Opinion filed May 12, 1973.

*E. Lael Alkire,* of Alkire, Clausing, Coldsnow, Bush and Wilkinson, of Wichita, argued the cause and was on the brief for the appellant.

*Reese Jones,* assistant district attorney, argued the cause, and *Vern Miller,* attorney general, *Keith Sanborn,* district attorney, and *Wallace Underhill,* assistant district attorney, were on the brief for the appellee.

*Ray Hodge,* of Beaty, Hodge and Wood, of Wichita, submitted a brief *amicus curiae.*

The opinion of the court was delivered by

FOTH, C.: Appellant was convicted of two counts of aggravated battery arising out of the brutal beating of two men in a grocery store parking lot in Wichita on November 18, 1971. Appellant was charged jointly with three others, but only he was convicted. He has appealed, alleging several trial errors.

At trial eyewitnesses told of a man being accosted by a group of seven other men, followed by what appeared to be a gang beating. The victim was knocked to the ground and there, while he was unconscious, his head was pounded against the pavement by one of the group. A bystander moved to intervene but was intercepted. He, too, was beaten, and when he was on the ground was "stomped" by a heavily booted assailant.

Testifying in his own behalf, appellant recounted how on that day he had started drinking with friends before 9:00 that morning. His thirst took him from gin through a little beer and a quantity of assorted fruit wines to whiskey—with a brief taco break at around 2:30 p. m. The group of friends kept changing, and there was a good deal of driving from house to house. There were at least two refueling stops, at one of which they bought "a whole sack full" of small bottles of beverages known as Red Ripple and Boone's Farm apple wine.

The last thing appellant remembered of that afternoon was being at a friend's house between 3:30 and 5:00 p. m. After that all was blank until he woke up sick that night, and again until he found himself the next morning at the Sedgwick county prison farm. He didn't remember ever seeing either of the victims before encountering them in court.

The gaps resulting from appellant's memory failure were filled by the testimony of several of his companions. While there was some disagreement as to when the drinking started there was none over the fact that the amount consumed was considerable. At about 5:00 p. m. the group had an inconsequential fight with three men

outside a liquor store. From there they progressed eventually to a grocery store for mixer where, at about 8:45, there occurred the encounter in question. There was general agreement among his companions that appellant sat astride the first victim, grabbed his hair and pounded his head on the ground. They agreed, also, that it was he who kicked the second man in the face, perhaps as many as three times.

After the fight the group repaired to appellant's house, where he bathed his swollen hand and took off his boots. En route he was quoted as saying "he didn't know what got into him, that all he could see was red and that he'd tried to kill him." Later, at the prison farm, appellant told his companions the fight started when he unsuccessfully tried to borrow a dollar from the first victim. While there he also apologized to his friends for getting them into so much trouble.

Appellant's first broad contention is that he should have had a package of instructions covering the defense of insanity. Thus he requested a basic instruction on insanity such as that given in *State v. Andrews*, 187 Kan. 458, 357 P. 2d 739; an instruction on the burden of proof where evidence of insanity is introduced, such as PIK Criminal 54.10; one covering the disposition of defendants who are acquitted by reason of insanity, under K. S. A. 1972 Supp. 22-3428; and one absolving him from responsibility for his acts if they were the result of involuntary intoxication (PIK 54.11). The trial court refused to give any of these instructions, and instead instructed on voluntary intoxication by giving PIK 54.12.

A criminal defendant is, of course, entitled to an instruction on his theory of defense if it is supported by any evidence whatever. *State v. Severns*, 158 Kan. 453, 148 P. 2d 488, Syl. ¶ 4; *State v. Osburn*, 211 Kan. 248, 505 P. 2d 742; *State v. Fitzgibbon*, 211 Kan. 553, 507 P. 2d 313. On the other hand, there must be evidence which, viewed in the light most favorable to the defendant, would justify a jury finding in accordance with the defendant's theory. *State v. Hamrick*, 206 Kan. 543, 479 P. 2d 854; *State v. Harden*, 206 Kan. 365, 480 P. 2d 53, Syl. ¶ 5.

In *Harden* we also held:

"Mental incapacity produced by voluntary intoxication, existing only temporarily at the time of the criminal offense, is no excuse for the offense, or defense to a prosecution for the offense. The test of insanity as affecting criminal responsibility, that the accused must have labored under such a defect of reason as not to know the nature of quality of the act, or, if he did

know it, that he did not know he was doing wrong, does not apply to drunkenness." (Syl. ¶ 6.)

Since the evidence in that case showed at most a loss of control due to intoxication, an instruction on insanity was not required.

The question presently before us, therefore, is whether appellant's evidence presented a bona fide issue of insanity, or merely demonstrated voluntary intoxication. Its resolution requires a brief review of his evidence on that issue.

Appellant was 23 years old at the time of the assault, and had spent thirty months in the army. He had returned from an eighteen-month tour in Vietnam the previous April. The last six months of that time had been spent in the stockade because two or three days before he was due to return to the States he had gotten drunk and had a fight with his commanding officer. He had also had a drunken bout at the age of sixteen, the exact nature of which was never made clear, but which apparently involved some sort of violence. He had been drinking heavily for the three months since he had been discharged in September, 1971, and regarded himself as being "on the verge of becoming an alcoholic." He sometimes had blackouts when he drank, and other times not.

One of his friends testified that appellant had gotten into previous fights, but always after drinking. Two witnesses who were engaged in the business of rehabilitating alcoholics and who had interviewed appellant in jail expressed the opinion that he was an alcoholic.

In addition appellant was tested and examined by two qualified psychiatrists, each of whom testified. Dr. C. J. Kurth had made a report to the court on appellant's fitness to stand trial, finding him able to do so and not suffering from any mental illness or defect at that time. His report was read by him from the stand as bearing also on appellant's mental condition at the time of the offense. It included the following comment:

". . . this individual's basic personality has in its structure the potential for poor emotional control under stress, tension or pressure. His personality further has a component of anxiety, poor interpersonal relationship and passive and aggressive qualities. When the defendant's basic personality is altered, the loosening of controls by drugs, alcohol, or a combination of both, his behavior could become extremely hostile and destructive. If he imbibes sufficiently of drugs, alcohol, or a combination of both, he could develop a total amnesia for time, events and actions while under the influence of such."

In his testimony the doctor amplified on this summary, but we think a fair reading of it indicates that his opinion was, in essence, that

appellant had a great deal of pent-up hostility which could be released by alcohol, and that when drinking, he might react with unpremeditated, "explosive" violence. Further, he might not later be able to remember what happened during one of these violent episodes. The closest Dr. Kurth came to describing a potential for violence not triggered by alcohol was his statement:

"I can say based on reasonable medical certainty, that if pushed far enough, this explosive reaction could occur without drugs or alcohol."

The difficulty with appellant's reliance on this testimony is that there is absolutely nothing to indicate that appellant ever had such an "explosive reaction" without alcohol. Certainly, as to this episode, *all* the evidence, including appellant's, is to the effect that he had been drinking. Asked about this particular incident, the doctor said:

"I think he lost all emotional control by combination of his basic personality traits and loosening of the inhibition of alcohol to where he just acted out."

Asked if the condition thus described met the legal definition of "insanity," as opposed to the medical definition of "mental illness," his response was:

"I would say that in this instance the word insane and mentally deranged are the same thing."

Clearly, once again, he was speaking of the alcohol-induced state which actually existed.

The testimony of Dr. Frank H. Harris was generally in accord with that of Dr. Kurth, although because of his frequent drinking Dr. Harris thought appellant was an "alcoholic," while Dr. Kurth did not. Dr. Harris noted:

". . . In going into his drinking the only time he's ever had these fights and does not remember what he has done is when he's drinking. When—he's a very sensitive person, has never had any trouble when not drinking. He said that in times when he has been in the midst of what was going to be a fight, he would walk away when he wasn't drinking."

He diagnosed appellant as: "cyclothymic personality, hypermanic type, and a hysterical neurosis, disassociative type." His definition of those terms was:

"Cyclothymic is the kind of individual who gets high and, oh, is aggressive and outgoing. And a hysterical neurosis disassociative type is an individual who can become disassociated for all intents and purposes."

In addition, he recognized "the possibility of a psychomotor

epilepsy" which, if it existed, would mean that indulgence in alcohol involved the risk of a grand mal seizure.

He summarized by saying:

"Under ordinary circumstances he is probably a shy individual as he states he doesn't like crowds. But when you give him alcohol he loses all sense of direction. He loses complete control and he becomes disassociated and I don't think he could tell you who was at the place or who he hit or why he hit them. . . . It would be my opinion that when this man drinks alcohol he over reacts to and loses all self control with even a very small amount of alcohol which results in his hostile feelings coming out by complete disassociation resulting in his inability to remember what has happened."

Dr. Harris went on to say that appellant's hostility would not be accelerated by the encouragement of others under normal circumstances, but that "[w]ith the alcohol it could," and that "I don't think he needs anybody for reinforcement under the influence of alcohol."

Finally, the doctor expressed the opinion that appellant was "well aware of his drinking problem." Appellant told the doctor that "he never had any trouble when he was sober" and that "these violent episodes appeared only when he was drinking."

When asked for his opinion as to appellant's "sanity or mental condition" at the time of the attack, he replied that at the time in question appellant "did not know what he was doing," but the doctor rightly felt that the legal conclusion of sanity or insanity was not within his province to decide.

To summarize, all the expert testimony, taken in its light most favorable to appellant, indicated that alcohol was the key factor in his loss of control and the *sine qua non* of all his difficulties. Therefore, under *State v. Harden,* supra, and the authorities discussed therein, appellant was not entitled to an instruction on insanity nor to the instructions which would otherwise accompany the basic insanity instruction.

We also said in *Harden:*

"Temporary insanity immediately produced by intoxication does not destroy responsibility for crime where the accused, when sane and responsible, voluntarily made himself drunk." (Syl. ¶ 7.)

This raises the question of whether appellant was entitled to the instruction he requested on involuntary intoxication.

The only evidence that could possibly be construed to mean that appellant's condition was "involuntarily produced" was the testimony of one of the alcoholic therapists that "[a]n alcoholic, not knowing he's an alcoholic would not have the power to say yes or

no—to drink or not to drink—especially after the first drink." There was no evidence to show that appellant was, on the morning in question or at any other time, irresistibly driven to take the first drink. Neither was there any effort made to distinguish among alcoholics and their manifestations or to classify appellant.

Evidence on the proclivities of alcoholics far more persuasive than that presented here was before the court in *Powell v. Texas*, 392 U. S. 514, 20 L. Ed. 2d 1254, 88 S. Ct. 2145. The claim in that case was that Powell, as a chronic alcoholic, lacked the power to abstain from drinking. Therefore, it was contended, he could not constitutionally be convicted of being drunk in a public place. Reliance for this proposition was placed on *Robinson v. California*, 370 U. S. 660, 8 L. Ed. 2d 758, 82 S. Ct. 1417, which had held that one cannot be convicted of a criminal offense which consists solely of being a narcotics adict. Illness alone could not be a crime. The Supreme Court rejected the analogy because Powell was charged, not with being an *alcoholic*, but with being *drunk*—and that in a public place. Volitional elements were recognized both in the process of achieving a state of drunkenness and in choosing the place to do so. We are here concerned with only the free will involved in the first aspect, that of getting drunk.

In *Powell* the opinion of Justice Marshall, for four members of the court, observed that "E. M. Jellinek, one of the outstanding authorities on the subject, identifies five different types of alcoholics which predominate in the United States, and these types display a broad range of different and occasionally inconsistent symptoms." (392 U. S. at 522-3.) And further, "Jellinek insists that conceptual clarity can only be achieved by distinguishing carefully between 'loss of control' once an individual has commenced to drink and 'inability to abstain' from drinking in the first place." (Id., 524-5.)

Tested against this standard, Powell's expert testimony was insufficient when it established only that "when appellant was sober, the act of taking the first drink was a 'voluntary exercise of his will,' but that this exercise of will was undertaken the 'exceedingly strong influence' of a 'compulsion' which was 'not completely overpowering.'" (Id., 525.) The concept of a "compulsion" to drink was found to be judicially unmanageable because of the lack of any intelligible definition upon which medical scholars could agree. The absurdity of accepting a "compulsion" to drink as an excuse for the drinker's conduct was illustrated by a hypothetical which seems tailor-made for this case:

"It is not difficult to imagine a case involving psychiatric testimony to the effect that an individual suffers from some aggressive neurosis which he is able to control when sober; that very little alcohol suffices to remove the inhibitions which normally contain these aggressions, with the result that the individual engages in assaultive behavior without becoming actually intoxicated; and that the individual suffers from a very strong desire to drink, which is an 'exceedingly strong influence' but 'not completely overpowering.'" (Id., 534-5.)

Surely, the author reasoned, not even the dissenters would hold such an individual unaccountable for his assaultive behavior. On this point the opinion concludes:

"Traditional common-law concepts of personal accountability and essential considerations of federalism lead us to disagree with appellant. We are unable to conclude, on the state of this record or on the current state of medical knowledge, that chronic alcoholics in general, and Leroy Powell in particular, suffer from an irresistible compulsion to drink and to get drunk in public that they are utterly unable to control their performance of either or both of these acts and thus cannot be deterred at all from public intoxication." (Id., 535.)

Justice Black, with Justice Harlan, in concurring was concerned with the results which would flow from imposing a constitutional requirement of *mens rea* which would recognize a disease-produced "compulsion" as a defense. He observed:

"But even if we were to limit any holding in this field to 'compulsions' that are 'symptomatic' of a 'disease,' in the words of the findings of the trial court, the sweep of that holding would still be startling. Such a ruling would make it clear beyond any doubt that a narcotics addict could not be punished for 'being' in possession of drugs or, for that matter, for 'being' guilty of using them. A wide variety of sex offenders would be immune from punishment if they could show that their conduct was not voluntary but part of the pattern of a disease. More generally speaking, a form of the insanity defense would be made a constitutional requirement throughout the Nation, should the Court now hold it cruel and unusual to punish a person afflicted with any mental disease whenever his conduct was part of the pattern of his disease and occasioned by a compulsion symptomatic of the disease." (Id., 545.)

Since we are constitutionally free to construe our own involuntary intoxication statute, we hold that before intoxication may be said to be "involuntary" a defendant must show an irresistible force, which is something more than a strong urge or "compulsion" to drink. Appellant here did not even show the latter; his evidence was that he got up and started drinking because he "thought it was a lot of fun." He was therefore not entitled to an instruction on involuntary intoxication.

As previously noted, the instruction on mental condition actually given in lieu of appellant's requested instructions was PIK Criminal 54.12:

"Voluntary intoxication is not a defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged, intoxication may be taken into consideration in determining whether the accused was capable of forming the necessary intent or state of mind."

This instruction was in accord with K. S. A. 1972 Supp. 21-3208 (2), which provides:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

Thus, voluntary intoxication such as afflicted appellant *would* be a defense if it rendered him incapable of forming a "particular intent" which formed a necessary element of the crime charged.

Aggravated battery, with which appellant was charged, is defined in K. S. A. 1972 Supp. 21-3414:

"Aggravated battery is the unlawful touching or application of force to the person of another *with intent to injure* that person or another and which either:

( *a* ) Inflicts great bodily harm upon him; or

( *b* ) Causes any disfigurement or dismemberment to or of his person; or

( *c* ) Is done with a deadly weapon, or in any manner whereby great bodily harm, disfigurement, dismemberment, or death can be inflicted." (Emphasis added.)

It may be seen that a "particular intent," *i. e.*, an intent to injure, is an essential element of the crime in any of its alternative forms. If such intent is absent, the application of force here would be simple battery, as defined by K. S. A. 1972 Supp. 21-3412. Or, as we observed in *State v. Warbritton,* 211 Kan. 506, 506 P. 2d 1152:

"The significant difference between 'battery' and 'aggravated battery' with respect to the facts of this case is that the latter requires an 'intent to injure' plus one of the enumerated alternative elements, while the former merely requires the application of 'force to a person of another, when done in a rude, insolent or angry manner'." (p. 508.)

Appellant requested an instruction on simple battery, and it was refused. He assigns the refusal as error here. In *Warbritton,* faced with a similar contention—that the defendant did not intend the injury produced—we applied the rule that:

"In a criminal prosecution where the offense charged may include some lesser offense it is the duty of the trial court, under the provisions of K. S. A. 1972 Supp. 21-3107 (3), to instruct the jury, not only as to the offense charged but as to all lesser offenses of which the accused might be found guilty under the information and upon the evidence adduced." (Syl. ¶ 1.)

We there held that an instruction on the lesser included offense of battery should have been given. So here, where the main thrust of appellant's evidence on intoxication was that he was incapable of forming the intent required by aggravated battery, we think he was entitled to the requested instruction on the lesser included offense.

Although what we have already said requires a reversal for a new trial, two further points deserve attention. Appellant claims error in the introduction over his objection of a number of sketches and diagrams made by an eyewitness a few hours after the event. The objective is that the artist-witness did not claim photographic accuracy for his drawings. They were admittedly his mental impressions of, for example, a group of men beating a fallen victim. To one he "just scribbled on about two more heads" because his first drawing did not contain what he remembered as "a good crowd." Another shows one man, wearing a hat, on top of another on the ground, while the witness admitted he didn't know whether the attacker wore a hat or not.

We are unable to find prejudicial error in the admission of these exhibits. All that is required is reasonable accuracy, and utility in aiding the jury to visualize the scene. *Nelson v. Hardesty*, 205 Kan. 112, 468 P. 2d 173. Such discrepancies as there may have been were fully explained, so that the jury could not have been misled. Cf. *State v. Johnson*, 210 Kan. 288, 502 P. 2d 802; *State v. Suing*, 210 Kan. 363, 502 P. 2d 718. The admissibility of the exhibits was discretionary with the trial court. While they might well have been excluded, if for no other reason than that they were cumulative, we cannot say the court abused its discretion in admitting them.

Finally, complaint is made of the court's "limiting" instruction. By the time the evidence was all in the jury had before it appellant's drunken escapade as a sixteen-year-old, his court-martial and stockade time in Viet Nam, and other assorted drunken fights. As to such evidence the trial court gave the following:

"You are instructed that evidence has been introduced by the State showing that on another occasion the defendant committed other acts similar to those charged in this case. You are instructed that if you believe such evidence and testimony to be true, it is not to be considered by you as evidence of the guilt of the defendant of the offense charged in this case. This evidence is to be considered by you only as circumstances bearing upon the question of defendant's knowledge, identity, *inclination, tendencies* or absence of mistake or

accident. This evidence should be considered along with all the other evidence for that purpose only." (Emphasis added.)

The instruction was overbroad. Under K. S. A. 60-455 "inclinations" or "tendencies" to commit crime are not to be shown by proof of prior delinquencies. We so held in *State v. Jenkins*, 203 Kan. 354, 454 P. 2d 496, although a majority thought the error there was not prejudicial under the circumstances of that case. See also, *State v. Martin*, 208 Kan. 950, 495 P. 2d 89; and *State v. Knowles*, 209 Kan. 676, 498 P. 2d 40.

In *State v. Masqua*, 210 Kan. 419, 502 P. 2d 728, we examined a limiting instruction which permitted the jury to consider the prior offenses for *all* of the purposes for which the statute makes them admissible. We observed:

". . . The instruction was not erroneous as a matter of law. . . . However, we enter our caveat to the district courts that instructions concerning the purpose of evidence of similar offenses should *only* include those elements of K. S. A. 60-455, which appear to be applicable under the facts and circumstances. *Those elements which are obviously inapplicable should not be instructed upon.*" (pp. 422-23. Emphasis added.)

A similar caveat is appropriate here. However, because we are reversing on other grounds, we need not decide whether prejudice resulted from the instruction given in this case.

The judgment is reversed and the case is remanded for a new trial.

APPROVED BY THE COURT.