No. 60,306

STATE OF KANSAS, *Appellee,* v. FRED MASSEY, *Appellant.*
(747 P.2d 802)

Opinion filed December 11, 1987.

*Martha J. Coffman,* assistant appellate defender, argued the cause, and *Benjamin C. Wood,* chief appellate defender, and *Melissa Sheridan,* assistant appellate defender, were on the brief for the appellant.

*Frank E. Kohl,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

HERD, J: This is a criminal action where a jury found Fred Massey guilty of first-degree murder, K.S.A. 21-3401, for the killing of his wife, Karen. Massey was sentenced to a maximum

term of life pursuant to K.S.A. 1986 Supp. 21-4501(a). Massey appeals.

The relevant facts are as follows. In 1980, Fred Massey retired after 23 years in the military police. In 1971, he had married Karen and after fourteen years of marriage filed for a divorce which would have become final in November of 1985. Karen planned to go back to school after the divorce. Meanwhile, they continued to live together.

Massey's alcoholism was a factor in the divorce. It was severe enough he had been placed in a treatment facility several times. In 1984, he began to have seizures which were alcoholism related. During the seizures, he would lose consciousness and fall to the floor, remaining unconscious for approximately 10 minutes. Dilantin was prescribed for him, and he experienced no seizures for the 15 months he was on the medication. His doctors soon began to reduce his dosage, however, because Dilantin does not mix well with alcohol.

Massey was taken completely off Dilantin in the middle of October 1985. He was, by this time, in the habit of drinking about a case of beer a day. On October 18, he picked up his .32 automatic pistol which had been left in a repair shop for over a year. The next day he purchased a box of .32 ammunition.

On November 1, Massey got up at 5:30 a.m. and began drinking beer. He watched television and drank beer all day while Karen was at work. Karen came home and watched television with him in the evening; Massey continued to drink until about 11:00 p.m.

The next morning was a Saturday. Massey woke up at 4:30 a.m. and drank coffee and watched television until 7:00 a.m., when he awakened Karen to go to a dental appointment. After she left, he continued watching television and started drinking beer. Karen came home around 9:30 a.m. and went upstairs to take a nap. Massey continued to watch television and drink beer.

Massey testified he went upstairs to the bathroom around noon. The couple's dogs followed him and awakened Karen by jumping on the bed. Massey said Karen lay in bed petting the dogs while they discussed their plans for going out with another couple that afternoon to fire the pistol Massey had retrieved from the shop.

As they talked, Massey took the box of bullets and the loaded pistol out of the nightstand on Karen's side of the bed. He remembered pointing the gun away from the bed as he picked it up. He did not remember whether he held the pistol with his palm on the grip and his finger on the trigger.

The next thing he remembered was coming to on the floor. He realized he had had a seizure because all the muscles in his body were stiff and sore. He stood and saw Karen lying on the bed with blood on her face. He pulled the bedspread back to see if she was breathing. Seeing she was not, he began shaking, ran downstairs, and drank two beers. When he went upstairs again to take her pulse, he was certain she was dead. He grabbed some underwear, the pistol, shells, and a .22 rifle, and left the house.

He drove around drinking for some time before thinking about the dogs left at the house. He returned for them and dumped them behind a fenced area on the highway. He told a friend he did this so the dogs would not maul Karen's body.

The guns were never found. Massey said he might have thrown them into the Missouri River. His next clear memory was of drinking beer in a room at the Cody Hotel. He left the Cody Hotel the next afternoon, still drinking steadily, and checked into the Best Western Motel. From there he called his father in Arkansas and asked him to call the police. His father told him this was something he should do himself, so Massey called the police department and, without explaining the situation, asked them to send a policeman to talk to him.

When an officer arrived, Massey invited him in and continued to drink beer and smoke one cigarette after another. The officer asked why Massey had called for him, but Massey only stared at the officer in silence until suddenly he said, "I killed my wife yesterday. . . . I want you to get her out of the house."

Officers found Karen lying with the blankets pulled up to her shoulders in the upstairs bedroom of the couple's house. A spent .32 caliber automatic shell casing was found on the pillow directly under her head. The bullet had entered just above her left ear and had exited just in front of her right ear. It appeared she had been shot while sleeping on her right side.

Massey spent Sunday night in jail. The next day, a deputy sheriff witnessed a seizure Massey had in his cell. His body

became very rigid, his arms extended, and he convulsively struck his head and upper body against the wall. The convulsions lasted about five minutes. Massey would not respond to his name either during the seizure or immediately after. Massey had no further seizures because he was put back on Dilantin.

For his first issue on appeal, Massey contends the trial court erred in failing to instruct the jury on his unconsciousness induced by the seizure.

At trial, Massey testified he had not intended to kill Karen. He claimed he must have discharged the gun accidentally while he was in the throes of a seizure. A doctor testified Massey could have had a seizure from alcohol withdrawal. He testified that even though he had consumed as many as six beers that morning, the level of alcohol in his blood might still have been very low because he drank a case of beer on Friday and then drank nothing during the night. The doctor testified there is no warning of alcoholic grand mal seizures. During such a seizure, while falling to the floor, Massey would have clenched his fists as his muscles became rigid. The doctor explained people usually wake up from a seizure in a confused state which can last anywhere from a few minutes to a couple of days. Massey argues this explains his erratic behavior after the shooting.

At the conclusion of the trial, the court gave the jury the general instruction on intent stating to find Massey guilty of murder the jury must find he killed Karen intentionally. The court did not give a separate instruction explaining unconsciousness is a complete defense to a crime so that, if the jury found the shooting occurred involuntarily during a seizure, Massey would have had no criminal intent and therefore could not be guilty of murdering Karen. Defense counsel made no objection to the instructions and proposed no additional instructions. Massey objected only to the court giving an instruction on second-degree murder.

Massey now argues the court should have given an instruction similar to that given by the trial court in *State v. Jackson,* 238 Kan. 793, 714 P.2d 1368, *cert. denied* 107 S. Ct. 88 (1986). After giving an instruction similar to that given in this case, that a person ordinarily intends the usual consequences of his voluntary acts, the trial court recognized epileptic seizures as rendering an act involuntary by adding the following instruction:

" 'If you find that Mr. Jackson was in the throes of an epileptic seizure at the precise time of the commission of the crimes and that the seizure rendered his actions unintentional and involuntary, you must find him not guilty of all charges and their lesser included offenses.' " 238 Kan. at 805.

Pattern Instructions for Kansas does not contain a specific instruction for the defense of unconsciousness from a seizure. The State argues Massey is asking this court to create a new instruction, never previously used in this state, and contends a specific instruction on "diminished capacity" would improperly emphasize Massey's case. 238 Kan. at 807-08 (Miller, J., concurring). Massey is not claiming diminished capacity; he is claiming lack of capacity by reason of a grand mal seizure.

The first question to be considered is whether the defense of unconsciousness by reason of a seizure is one a trial court must accept. It is a basic tenet of criminal law that the State punishes only voluntary acts. A person cannot be held responsible for an act he commits while he is unconscious. See *e.g.*, 22 C.J.S., Criminal Law § 55. There must be a criminal intent (*mens rea*) for a person to be guilty of committing a crime.

The defense of a seizure causing unconsciousness is nevertheless greeted with skepticism. There is seldom a murderer who acknowledges memory of his act. The defense of unconsciousness has been held not to be available to a defendant when the unconsciousness is a result of emotion caused by the killing. *Commonwealth v. Crosby*, 444 Pa. 17, 279 A.2d 73 (1971).

*Crosby* held the defendant must show the unconsciousness resulted from a physical condition such as epilepsy. 444 Pa. at 22. Here it is clear Massey had a physical condition which caused him to suffer seizures which caused unconsciousness. His doctors testified Massey's seizures were caused, at least in part, by alcohol abuse and withdrawal. The question then presented is whether such seizures are to be equated with seizures totally beyond a person's original control. We hold they are, because such seizures are not the *immediate* result of voluntary intoxication. In *State v. Seely*, 212 Kan. 195, 510 P.2d 115 (1973), this court held a defendant is not entitled to an *insanity* instruction when his voluntary intoxication causes immediate loss of control or even seizure. See *United States v. Shuckahosee*, 609 F.2d

1351 (10th Cir. 1979), *cert. denied* 445 U.S. 919 (1980). In Massey's case, however, the evidence was that if his seizures *were* alcohol-related, they occurred only from the consequences of long-term abuse or as an immediate effect from *withdrawal.*

The defenses of unconsciousness due to seizure and insanity are closely related because both negate *mens rea.* Some courts consider them to be the same. See Annot., 27 A.L.R.4th 1077.

In *State v. Jerrett,* 309 N.C. 239, 307 S.E.2d 339 (1983), there was evidence the defendant in a first-degree murder case had suffered blackouts, possibly as a result of his exposure to Agent Orange. He claimed to be in one of these blackouts when the killing was committed. The trial court instructed on insanity but refused to instruct on the defense of unconsciousness. The appellate court held that while unconsciousness is a defense related to insanity in that the defendant cannot have the mental capacity to commit the crime, it goes beyond an insanity defense because it negates even the possibility of a voluntary *act.* The court thus reversed and required an instruction on the defense of unconsciousness. 309 N.C. at 264-66.

The court in *Smith v. Commonwealth,* 268 S.W.2d 937 (Ky. 1954), held a defendant claiming unconsciousness due to epileptic seizure was entitled to an instruction explaining the jury may not find him guilty if it believed he was unconscious at the time of the act. But the court also required the jury to be instructed it might find a defendant acted with reckless disregard for life if he drove a car knowing he was subject to blackouts.

The defense of unconsciousness during a potentially criminal act due to epileptic seizure is accepted in this state. See *State v. Pettay,* 216 Kan. 555, 556-57, 532 P.2d 1289 (1975). The defense is separate from that of insanity, for there is no issue of whether the defendant knew right from wrong; there is unquestionably no *mens rea* when one is unconscious.

It is now recognized that epilepsy is a symptom, rather than a disease. Attacks of epilepsy are generally referred to as seizures. Brain's Diseases of the Nervous System § 22 (9th ed. 1985). See Adams and Victor, Principles of Neurology, Ch. 15 (3d ed. 1985).

The "grand mal" seizures which Massey suffered are generalized, convulsive seizures which have been traditionally distinguished from localized "petit mal" seizures which do not cause

sustained unconsciousness. Brain's Diseases of the Nervous System § 22; Principles of Neurology, Ch. 15; 1 Kaplan and Sadock, Comprehensive Textbook of Psychiatry § 3 (4th ed. 1985); Bleck, *Epilepsy,* 33 Disease-a-Month 612, 622-23 (1987).

Epilepsy is caused by an "abnormal conversion of the potential energy of the neurones into kinetic energy. Fundamentally, it is a physico-chemical disturbance, and the physico-chemical state of the neurones can be influenced by numerous agencies." Brain's Diseases of the Nervous System § 22; See Principles of Neurology Ch. 15, 40. Despite lingering popular beliefs, researchers do not believe epilepsy to be caused by any psychological factors.

Almost everyone is potentially epileptic, but most people have a high epileptic threshold under which the provocation causing epilepsy—such as an injury to the head, alcohol abuse, inborn metabolism errors, endocrine disorders, or other factors—must be intense. There is a continuum in the population which at its other end includes over a million people in the United States who are subject to epilepsy with little provocation. See Brain's Diseases of the Nervous System § 22; Principles of Neurology Ch. 15.

There are several different theories of chemical imbalances which might cause certain people to be more susceptible to epilepsy than others; none have been proven as yet. Alcohol is one metabolic factor which is believed to upset neural receptor interactions. Only a few drinks may cause seizures in a person highly susceptible to epilepsy, while habitual abuse may cause epilepsy in a person who would otherwise escape it. See Brain's Diseases of the Nervous System § 22; Principles of Neurology Ch. 15; 33 Disease-a-Month 612, 661; Comprehensive Textbook of Psychiatry § 3.

Some researchers differentiate between seizures caused by alcohol, sometimes called "alcoholic epilepsy," or "rum fits," and other types of seizures, and do not label seizures caused by alcohol epileptic. Other researchers, however, consider alcoholic epilepsy to be only one of the many forms of epilepsy, most of which are idiopathic, meaning of unknown cause. See Brain's Diseases of the Nervous System § 22; Principles of Neurology Ch. 15; Comprehensive Textbook of Psychiatry § 3.

Seizures caused by alcoholism are indistinguishable from the seizures of the many different idiopathic epilepsies. Brain's at 428. Whatever the cause, unless the epilepsy is of the rare type which can be treated by surgery, seizures are usually treated by drugs. One of the drugs most commonly used is phenytoin, which has the trade name of Dilantin. Dilantin is very effective in preventing seizures, but patients discontinuing the drug, especially those who have taken the drug only two or three years, face a high probability of seizures reoccurring. See Brain's Diseases of the Nervous System § 22; Principles of Neurology Ch. 15; 33 Disease-a-Month 612, 661; Comprehensive Textbook of Psychiatry § 3.

There was clear evidence in this case, both expert and eye-witness, that Massey suffered from seizures which are indistinguishable in effect and treatment from other types of epileptic attacks believed to be caused by non-localized provocation. See Brain's Diseases of the Nervous System § 22; Principles of Neurology Ch. 15. Massey was known to have suffered seizures, and had received medical treatment for his condition. Only two days after the shooting, he was observed by the deputy sheriff to have another seizure.

Even if Massey's seizure defense were to be equated with insanity, and then not allowed because held to be caused by voluntary intoxication, it could still be used to negate the specific intent required to prove first-degree murder. *State v. Seely,* 212 Kan. at 203. If unconsciousness and insanity were to be completely equated, however, unconsciousness would require notice of a plea of insanity. K.S.A. 22-3219. We hold the defense of unconsciousness by reason of a seizure is hereby recognized and that it should be equated with epilepsy rather than insanity.

The next question is whether the evidence in this case is sufficient to require an instruction. The only evidence Massey had a seizure at *the time of the shooting* is his own testimony.

The State of Georgia, in *Starr v. State,* 134 Ga. App. 149, 213 S.E.2d 531 (1975), equated the defendant's defense of epileptic seizure with an insanity defense, but found an instruction to the jury on insanity was not required because, although there was evidence the defendant suffered from seizures, the only evidence such a seizure took place at the time of the killing was the

defendant's testimony that she did not remember what happened. 134 Ga. App. at 150. See *Corder v. Commonwealth*, 278 S.W.2d 77 (Ky. 1955).

In California, however, a defendant *is* entitled to an instruction on the defense of unconsciousness when the only evidence he was unconscious is his own statement he cannot remember what happened. In *People v. Wilson*, 66 Cal. 2d 749, 59 Cal. Rptr. 156, 427 P.2d 820 (1967), the defendant shot and killed his wife who had filed for a divorce. The defendant testified he could not remember much about the incident. The trial court refused an instruction on unconsciousness but the appellate court found this to be reversible error, saying no matter how incredible the defense theory, a criminal defendant is entitled to have the jury instructed on that theory. 66 Cal. 2d at 762. See *People v. Anderson*, 63 Cal. 2d 351, 46 Cal. Rptr. 763, 406 P.2d 43 (1965), and *People v. Martin*, 87 Cal. App. 2d 581, 197 P.2d 379 (1948).

This court, in *State v. Pettay*, 216 Kan. at 556-57, held there was sufficient evidence the defendant was not in the throes of a seizure at the time of the offense to support a *conviction* for theft. This court's assumption a "proper instruction" was given in the case indicates an instruction should be given in Kansas on the strength of the defendant's own testimony.

A criminal defendant has the right to have the jury instructed on any theory of defense supported by the evidence. In *United States v. Lofton*, 776 F.2d 918 (10th Cir. 1985), the defendant's defense in a homicide case was heat of passion. The trial court instructed on heat of passion in its manslaughter instruction, but did not explain to the jury this was the defendant's only defense to murder. The court held: "When a criminal defendant has raised a theory of defense, the trial court should refer to that theory and to the testimony bearing on it and submit the issue with an instruction on the applicable law. . . . Arguments and evidence cannot substitute for instructions by the court." 776 F.2d at 920-21.

In *State v. Seely*, 212 Kan. 195, 200-02, the defendant asked the trial court to instruct the jury on the defenses of insanity and involuntary intoxication. This court held such instructions should have been given had there been evidence supporting such defenses. Here Massey did not ask the court for an instruction on unconsciousness.

In *People v. Sedeno,* 10 Cal. 3d 703, 112 Cal. Rptr. 1, 518 P.2d 913 (1974), a defendant charged with first-degree murder argued he had been unconscious when shooting an officer because of a blow to his head, but failed to ask the trial court for an instruction on the defense of unconsciousness. The appellate court nevertheless held "[t]he duty to instruct, *sua sponte,* on general principles closely and openly connected with the facts before the court also encompasses an obligation to instruct on defenses, including self-defense and unconsciousness, and on the relationship of these defenses to the elements of the charged offense." 10 Cal. 3d at 716. The court further noted the duty to give such instructions arose only when it was apparent the defendant was relying on such a defense, or if there was substantial evidence and the defense was not inconsistent with the defendant's arguments.

In *State v. Smith,* 161 Kan. 230, 167 P.2d 594 (1946), the defendant in a homicide case did not ask the trial court for a self-defense instruction. This court held such an instruction should nevertheless have been given, as there was evidence warranting such an instruction.

*Smith,* however, was decided prior to the enactment of K.S.A. 22-3414(3). Because Massey did not object to the trial court's omission of an unconsciousness instruction, he now has the burden of proving such an omission was clearly erroneous. The omission is clearly erroneous only if this court is convinced the jury might have found Massey not guilty of first-degree murder if the trial court had instructed on unconsciousness. See *State v. Houck,* 240 Kan. 130, 139, 727 P.2d 460 (1986). We hold the failure to give an instruction on unconsciousness was clearly erroneous.

This is not to say the uncorroborated testimony of a defendant in a criminal case that he was unconscious by reason of a seizure at the time of the commission of an alleged crime is sufficient to require an instruction on unconsciousness. But, corroboration such as present in this case is sufficient to require an instruction thereon to the jury.

The next issue is whether the trial court erred in failing to give PIK Crim. 2d 68.09.

The trial court instructed the jury according to PIK Crim. 2d 56.03:

"If you cannot agree that the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree."

Massey argues the trial court should have added PIK Crim. 2d 68.09. This instruction is derived from K.S.A. 21-3109, which states: "When there is a reasonable doubt as to which of two or more degrees of an offense [the defendant] is guilty, [the defendant] may be convicted of the lowest degree only."

In *State v. Trujillo,* 225 Kan. 320, 323, 590 P.2d 1027 (1979), this court held it was error for a trial court to fail to give PIK Crim. 2d 68.09. Because the defendant did not request the instruction, however, this court found no reversible error under K.S.A. 22-3414(3), as the omission was held not clearly erroneous. We find, as in *Trujillo,* that it was error to fail to give PIK Crim. 2d 68.09, but the failure was not clearly erroneous and thus not reversible error.

The final issue is whether the trial court erred in failing to grant a mistrial when a State's witness, who was warned of an order in limine, violated that order while giving testimony before the jury.

The bedspread which had covered Karen had a hole in it which the police believed to be a bullet hole. The bedspread was taken to the K.B.I. laboratory to determine whether the hole was in fact caused by a bullet, but no tests were performed. Massey therefore moved for an order in limine prohibiting the State's witnesses from testifying they believed the hole to be a bullet hole. The Court granted the order, and the State warned the testifying detectives they were not allowed to give an opinion on what caused the hole.

The matter was important because there were no powder burns surrounding the entrance wound on Karen's head. One explanation for an absence of powder burns is that the gun was at least two feet away from the victim when it was fired. This would support Massey's theory of accidental discharge during a seizure.

The other explanation for the lack of powder burns is that a barrier was inserted between the gun and the victim's head. Massey admitted he knew a gun fired at close range would leave

powder burns. The State theorized he pulled the bedspread over her head before aiming the gun close to her head.

Over the objection of Michael Waite, Massey's counsel, the trial court allowed the bedspread to be admitted on the understanding the jury would be left to draw its own conclusion about the hole. Frank Kohl, attorney for the State, then asked Detective Bradford:

"Q: And, Detective Bradford, were there any type of markings on the bedspread of any kind that you observed?
"A: Yes, sir.
"Q: Was it torn, tattered?
"A: Yes, sir.
"Q: And in what way?
"A: It appeared to be a bullet hole through the bedspread.
"Mr. Waite: If we may approach the bench."

After Massey moved for a mistrial, the court declared it would take the matter under advisement and discuss it during the next break. Kohl continued the examination.

Kohl: "And so your testimony about the hole in the blanket is just based upon your speculation, is that correct?
"A: Speculation of what I observed.
"Q: So you haven't run any type of tests, made any type of determination to determine how that hole was made in the blanket?
"A: No, sir."

During the next break, the trial court denied Massey's motion for a mistrial. It found no evidence of intentional misconduct by the State and found the error was not such that would require a mistrial. The trial court also stated: "[I]t was a violation of the spirit of the Court's order, but it was not a violation of the actual language of the Court's order on the Motion in Limine." This referred to the fact the motion was originally directed at Detective Albright, who testified at the preliminary hearing that he believed the holes to be bullet holes, rather than at Detective Bradford. The record does not contain the court's actual order, although it does contain defense counsel's motion which requested the State be denied the "use of any testimony by any person concerning their knowledge, belief or conclusion that the holes in the bedspread found at the residence of the victim were in fact bullet holes."

The court further noted that Kohl, in his examination after the

violation, was careful to point out to the jury that the detective was only stating an opinion. The trial court did not instruct the jury to disregard the testimony.

The court later denied another motion for a mistrial based on a report in the Leavenworth Times that Detective Bradford had testified the hole appeared to be a bullet hole. The court held there was no evidence the jury had disregarded its instructions not to read the newspapers. It also stated the article disclosed no information the jurors had not already heard.

The State, in closing arguments, reminded the jurors the lack of powder around Karen's wound might have been caused by a barrier inserted between her head and the gun. The State went on to say:

"There is a blanket that was on the bed, there is a hole in the blanket, and we can't prove what made that hole in the blanket, all we can do is look at the possibilities. That's what you can do as members of the jury, look at the possibilities. Is it possible, based upon the evidence, and you will have it all to examine when you go back, that if at the time that the victim was shot, that the blanket was pulled over her head? If it was, the blanket wasn't there when she was found by the police. And if it was, we have no indication to believe that anyone other than the defendant moved it."

Massey contends the trial court should have granted a mistrial under K.S.A. 22-3423(1)(c), which provides a court may grant a mistrial when prejudicial conduct makes it impossible to proceed without injustice to the defendant.

Declaration of a mistrial is a matter entrusted to the trial court's discretion and the decision will not be set aside on appeal unless abuse of discretion is clearly shown. The defendant has the burden of proving he was substantially prejudiced. *State v. Bagby,* 231 Kan. 176, 179, 642 P.2d 993 (1982).

In *State v. Hollis,* 240 Kan. 521, 534, 731 P.2d 260 (1987), the defendant moved for a mistrial because prejudicial hearsay was admitted. The court denied the motion, but struck the testimony and ordered the jury to disregard it. This court held this action by the court cured the error and emphasized that the trial court's "discretion is abused only where no reasonable person would take the view adopted by the court."

In *State v. Goodwin,* 223 Kan. 257, 573 P.2d 999 (1977), a police officer testified he saw the defendant, who was charged

only with aggravated robbery and burglary, while he was looking for a car connected with a possible homicide. This court found the improper answer was not grounds for mistrial. The question itself was proper, and this court realized it is impossible for a trial court to anticipate all possible improper testimony. This court held it must look to the extent the defendant was prejudiced by the improper remark to determine if mistrial was warranted.

We find no Kansas cases in which improper testimony was given in violation of an order in limine. However, some jurisdictions hold defiance of an order in limine is not reversible error as long as the trial court instructs the jury to disregard the testimony. Michigan has found instructing the jury to disregard can cause even more prejudice to the defendant, and therefore holds a new trial is necessary regardless of limiting instructions. Texas has held there is no reversible error if the defendant did not object at trial. See Annot., 63 A.L.R.3d 311, § 4.

In *State v. Quick,* 226 Kan. 308, 311, 597 P.2d 1108 (1979), we stated a motion in limine "should be granted only when the trial court finds two factors are present: (1) The material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) The mere offer of or statements made during trial concerning the material will tend to prejudice the jury." This court held such motions should be strictly limited to their purpose of preventing prejudice during trial. See *State v. Stellwagen,* 232 Kan. 744, 748, 659 P.2d 167 (1983).

We conclude the violation prejudiced Massey. Thus the question is whether a reasonable person would agree with the trial court's determination that the facts elicited by the State after the violation made it possible to proceed without substantial injustice to Massey. *State v. Hollis,* 240 Kan. at 534; *State v. Bagby,* 231 Kan. at 179. We think not. We hold the State's failure to obey the order in limine was reversible error and the trial court abused its discretion in failing to grant a mistrial.

The judgment of the trial court is reversed and the case is remanded for a new trial.

McFARLAND, J., dissenting.