No. 97,420

STATE OF KANSAS, *Appellee*, v. WALTER L. ANDERSON, *Appellant*.

(197 P.3d 409)

Opinion filed December 5, 2008.

*Michael J. Bartee,* of Michael J. Bartee, P.A., of Olathe, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke,* deputy district attorney, argued the cause, and *Jerome A. Gorman,* district attorney, and *Stephen N. Six,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Walter L. Anderson directly appeals his jury convictions of felony murder and aggravated robbery. Our jurisdiction is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the trial court err in refusing Anderson's request to instruct on compulsion? No.
2. Did the trial court commit reversible error in allowing witnesses to testify about what the decedent had expressed at the crime scene? No.
3. Did the trial court commit reversible error in its instruction on presumption of innocence? No.

Accordingly, we affirm the district court and convictions.

## FACTS

Gustavo Ramirez-Mendez (Gus) worked as a maintenance man at the Silver City Apartment Complex in Kansas City, Kansas. Late the night of January 14, 2005, Gus was robbed and severely beaten outside his apartment. He died 6 days later as a result of his head injuries.

Walter L. Anderson and Timothy Bryant were arrested and charged with aggravated robbery and felony murder in connection with the incident. The cases were separated for trial, and Bryant's convictions were affirmed by this court in *State v. Bryant*, 285 Kan. 970, 179 P.3d 1122 (2008).

Gus was friends with several residents of the apartment complex. He spoke very little English, but his friends were able to understand him. Rosie Bryant Allen (Rosie), codefendant Bryant's mother, was one of those friends.

At trial, Rosie testified that on the night of January 14, Anderson asked her to take him to a check-cashing store to get a $45 or $50 check cashed. They stopped at the liquor store on the way home, and after they returned, several people—including Bryant and Anderson—gathered at Rosie's house to drink and socialize.

According to Rosie, Gus arrived around 8 or 8:15 p.m. He asked Rosie's grandson, Kevin, to take him to get his $118 paycheck cashed. Kevin and Gus then returned to Rosie's and started drinking beer and whiskey with the others. A few hours later, Rosie told everyone they had to leave because she was tired.

Otilia Dominguez (Otilia), who was visiting family at the apartment complex, testified that around 11 or 11:30 p.m. she heard a "real hard" knocking on the front door. When she looked out the peephole, she saw an arm break out the porch light.

According to Otilia, she woke up her son-in-law, Miguel Garcia Rodriguez (Miguel), and told him they needed to call 911. At trial, a recording of her conversation with the 911 operator was played, disclosing that she said "two black guys were beating up on another guy." At trial, however, when questioned about this statement, she denied that she had seen the three men.

Otilia testified that when the police arrived, she and Miguel went outside and saw someone lying on the sidewalk. Miguel recognized the person as his friend, Gus. Gus' coat, shoes, and socks had been torn off him. His billfold had been rummaged through and its contents strewn over the grass.

At trial, Miguel testified that he asked Gus what happened. Gus only said "help me." After being prompted by the police, Miguel

asked Gus who did this to him. Gus "couldn't say anything" but lifted up two fingers.

Officer Mark Bundy, one of the first officers on the scene, testified that Gus was in and out of consciousness. He also testified that according to Miguel, the translator, "the victim had been walking through the complex and that he was attacked by two black males who had beat him up and taken his billfold." Officer Amy Allen-Sillings corroborated that Miguel interpreted for Gus, who said that two males had hit him really hard and taken his money. Similarly, Officer Jason Allen testified that his report reflected that based on Gus' statements, the suspects were described as two black males.

Anderson gave a videotaped statement to the police in which he admitted that he participated in the robbery. In the statement, Anderson explained what happened as he, Gus, and Bryant walked through the apartment grounds. His trial testimony was essentially the same, except there he stated, for the first time, that he went through Gus' pockets only because he felt threatened by Bryant. The following facts are taken from his statement played to the jury, his testimony, or both.

According to Anderson, he had known Bryant for 3 years, and he first met Gus the previous fall at Rosie's house. Anderson worked at Deffenbaugh and was paid between $360 and $420 every Friday. However, on the day of the incident, he did not pick up his paycheck because he had no ride and was unable to go to work. He did pick up a $65 money order from Rosie that night as repayment for money her husband had borrowed from Anderson.

Rosie took Anderson to the check cashing store and they stopped at a liquor store on the way back. People gathered at her house to drink and party and several of them, including himself, Bryant, and Gus, were smoking marijuana.

According to Anderson, Rosie finally told everyone to leave because she was tired and she was sick of Bryant asking her for money. Gus left first, then Anderson, and Bryant left shortly thereafter. As they walked toward the entrance to the apartment complex, Gus stopped and turned around, and Bryant and Anderson

caught up with him. As they walked, Gus said that he wanted to go to a bar, but Anderson said that he wanted to go home.

As they walked through the complex, Bryant asked Gus for money, but Gus replied he did not have any. Bryant told Gus he knew that Gus had money because Gus had just cashed his check. Gus responded, "[N]o, go to the bar."

According to Anderson, when they got to Gus' apartment, Gus threw his duffel bag inside and shut the door. At that point, Anderson heard Gus and Bryant exchanging words. Gus walked away as if he was going to the other side of the building. Bryant then told Anderson to ask Gus for money. Anderson said "no" and indicated that he was going home.

Bryant again told Anderson to ask Gus for money, so Anderson walked through the entryway where Gus was standing and asked him for money. Anderson explained that because he previously had borrowed money from Gus, he figured he could borrow money again and later pay Gus back. He thought he then would simply give the borrowed money to Bryant, so Bryant would leave Gus alone. Gus denied Anderson's request, saying he wanted to go to the bar.

At that point, Anderson heard a light break. Then Bryant came past him down the steps and hit Gus in the head with a gin bottle.

After this blow, Anderson asked Bryant what he was doing. Bryant then told Anderson to help him get Gus' money. Anderson went through Gus' pockets but did not find any money. He gave Bryant Gus' wallet. Bryant told him to keep looking, so he went through Gus' shoes and socks but still did not find anything.

Anderson asked Gus if he was all right because Gus was moaning and groaning. Gus "waived his hands like he was alright, go." Anderson jumped over the fence, followed by Bryant, and they both started running.

They ran to an apartment building behind the complex where they bought and smoked crack cocaine. Anderson paid with the money from the cashed money order. He then went to Rosie's house, but no one answered the door. He eventually walked 1½ to 2 hours to his sister's apartment.

A jury convicted Anderson of felony murder and aggravated robbery, and he was sentenced to a life term without the possibility of parole for 20 years (hard 20) for the murder plus 102 months in prison for the aggravated robbery, to be served consecutively.

Additional facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1: *The trial court did not err in refusing Anderson's request to instruct on compulsion.*

Anderson argues that the trial court erred when it refused to give a jury instruction on compulsion in violation of his absolute right to present his sole theory of defense. The State counters that the court was not required to give the instruction because insufficient evidence was presented to support it.

The parties disagree somewhat on the appropriate standard of our review. Citing *State v. Bell*, 276 Kan. 785, 80 P.3d 367 (2003), Anderson argues he is entitled to an instruction on his theory of the case even where the evidence is slight and supported only by his own testimony. The State responds that the trial court has a duty to instruct the jury on the law applicable to the parties' theories, so far as those theories "are supported by competent evidence," citing *State v. Farmer*, 212 Kan. 163, 510 P.2d 180 (1973). The State also contends that if there is "insufficient evidence supporting the defense or *where it would be misleading to the jury*, the court is not required to give the instruction," citing *State v. Josenberger*, 17 Kan. App. 2d 167, 836 P.2d 11 (1992). (Emphasis added.)

As these authorities suggest, some confusion has arisen over the years concerning our precise standard of review. This court has sometimes used the "competent evidence" standard articulated in *Farmer* and has sometimes slightly varied it. See, *e.g.*, *State v. Myers*, 233 Kan. 611, 616, 664 P.2d 834 (1983) (duty to instruct jury on law applicable to parties' theories "so far as those theories are supported by *any* competent evidence"). Also, the "misleading to the jury" standard from the 16-year-old Court of Appeals' decision in *Josenberger* has been used only in that case.

Additionally, in *Bell* and many cases since then we have failed to include an integral part of our earlier standard for reviewing requests for instruction on a theory of defense: that the evidence must also be sufficient to justify a jury finding in accordance with that theory. Accordingly, a review and clarification of our standard is necessary.

We begin by noting that in the compulsion case of *State v. Oliver*, 280 Kan. 681, 706, 124 P.3d 493 (2005), *cert. denied* 547 U.S. 1183 (2006), we held:

"The district court 'must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence.' *State v. Williams*, 277 Kan. 338, 356, 85 P.3d 697 (2004). 'A defendant is entitled to an instruction on his or her theory of the case even though the evidence thereon is slight and supported only by the defendant's own testimony. [Citation omitted.]' *State v. Bell*, 276 Kan. 785, 792, 80 P.3d 367 (2003). Further, as mentioned, this court reviews the evidence in the light most favorable to the party requesting the instruction when considering the district court's refusal to give a requested instruction. *Williams*, 277 Kan. at 356."

The legislature has addressed the defense of compulsion in K.S.A. 21-3209, which states:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

PIK Crim 3d. 54.13 echoes the statute.

In this court's interpretation of compulsion, it has expanded the statutory factors and has repeatedly held:

"[T]o constitute the defense of compulsion, coercion or duress must be present, imminent, impending, and continuous. It must be of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to oneself or one's family if the act is not done. The doctrine of compulsion cannot be invoked as an excuse by one who had a reasonable opportunity to escape the compulsion or avoid doing the act without undue exposure to death or serious bodily harm. A threat of future injury is not enough. [Citations omitted.]" *State v. Matson*, 260 Kan. 366, 385, 921 P.2d 790 (1996).

Now that we have reviewed compulsion's most recent history, we address clarification. Specifically, before our *Bell* decision in 2003, we often had stated that the evidentiary standard for granting the compulsion instruction request was something greater than "slight and supported only by the defendant's own testimony." For example, that same year, in *State v. Kessler,* 276 Kan. 202, 210, 73 P.3d 761 (2003), we had recognized some similarities to the *Bell* standard but also some differences:

"A defendant is entitled to instructions on the law applicable to his or her theory of defense [1] if there is evidence to support the theory. [2] *Furthermore, there must be evidence which,* viewed in the light most favorable to the defendant, *would justify a jury finding in accordance with the defendant's theory. State v. Flournoy,* 272 Kan. 784, 806, 36 P.3d 273 (2001); *State v. Gonzales,* 253 Kan. 22, 23, 853 P.2d 644 (1993)." (Emphasis added.)

Our decision 30 years before *Kessler* in *State v. Seely,* 212 Kan. 195, 197, 510 P.2d 115 (1973), made the same two distinctions, but in a slightly different way:

"A criminal defendant is, of course, entitled to an instruction on his theory of defense [1] if it is supported by any evidence whatever. [Citations omitted.] [2] *On the other hand, there must be evidence which,* viewed in the light most favorable to the defendant, *would justify a jury finding in accordance with the defendant's theory. State v. Hamrick,* 206 Kan. 543, 479 P.2d 854; *State v. Harden,* 206 Kan. 365, 480 P.2d 53, Syl. ¶ 5." (Emphasis added.)

Similarly, our decision 10 years before *Kessler* in *State v. Gonzales,* 253 Kan. 22, 23, 853 P.2d 644 (1993), made the same two distinctions, but yet again in a slightly different way:

"A defendant is entitled to an instruction on his or her theory of defense [1] if the theory is supported by evidence. [2] *At the same time, 'there must be evidence which,* viewed in the light most favorable to the defendant, *would justify a jury finding in accordance with the defendant's theory.' State v. Seely,* 212 Kan. 195, 197, 510 P.2d 115 (1973)." (Emphasis added.)

The same year as the *Gonzales* decision, this court stated the second standard in a slightly different way in *State v. Hernandez,* 253 Kan. 705, 710-11, 861 P.2d 814 (1993). The *Hernandez* court held that, for an instruction to be given on the complete defense of "defense-of-another," the evidence as a whole must be sufficient to "support an affirmative finding by a rational factfinder" on the

defendant's theory. 253 Kan. at 710-11. There, the legal issue was whether the defendant not only sincerely, but also "reasonably," believed it was necessary to kill to defend his sister. 253 Kan. at 711. This court held the trial court correctly refused to give the requested instruction, concluding "that a rational factfinder could not find that [defendant] acted in defense of his sister . . . at the time he shot [victim.]" 253 Kan. at 713.

As is evident from the language of the *Kessler* component, and its variations, presently missing from the standard of review—that the evidence must also be sufficient to justify a jury finding in accordance with defendant's theory—it is somewhat similar to our current standards for reviewing jury instructions on lesser included offenses. We defined that standard recently in the murder case of *State v. White*, 284 Kan. 333, 347, 161 P.3d 208 (2007):

> " ' "A trial court must instruct the jury on a lesser included offense 'where there *is some evidence which would reasonably justify a conviction' of the lesser offense.* [Citation omitted.] 'If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive.' [Citation omitted.] *'However, the duty to so instruct arises only where there is evidence supporting the lesser crime.'* [Citation omitted.] *An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented.* [Citation omitted.]" ' *State v. Boyd,* 281 Kan. 70, 93, 127 P.3d 998 (2006) (quoting *State v. Drennan,* 278 Kan. 704, 712-13, 101 P.3d 1218 (2004)." (Emphasis added.)

The *White* court upheld the trial court's denial of a requested instruction on voluntary manslaughter which was based upon the imperfect version of a complete defense: defense-of-another. As we concluded, "[s]imply put, a jury could not reasonably convict on this lesser included offense based upon the evidence presented. [Citations omitted.]" 284 Kan. at 353.

In short, case law indicates that in situations similar to Anderson's complete defense of compulsion—*Hernandez* (alleged perfect and complete defense-of-another) and *White* (alleged imperfect defense-of-another)—the affirmative-defense-based instructions can only be given when the evidence is sufficient to justify a rational factfinder finding in accordance with that defense theory.

The particular defense of compulsion is an especially appropriate fit for this test. As mentioned, K.S.A. 21-3209(1) provides: "A person is not guilty of a crime . . . if he *reasonably* believes that death or great bodily harm will be inflicted upon him . . . if he does not perform" the act. (Emphasis added.)

Similarly, our compulsion case law adds that the coercion or duress must be "of such a nature as to induce a *well-grounded* apprehension of death or serious bodily injury to oneself or one's family if the act is not done." (Emphasis added.). *Matson*, 260 Kan. at 385; *State v. Davis*, 256 Kan. 1, Syl. ¶ 3, 883 P.2d 735 (1994); *State v. Hunter*, 241 Kan. 629, 645, 740 P.2d 559 (1987); *State v. Milum*, 213 Kan. 581, 583, 516 P.2d 984 (1973).

In sum, our compulsion statute provides that a jury must consider if the defendant "reasonably" believes, and our case law provides that a jury must consider if the coercion or duress induces a "well-grounded" apprehension. As a result, merely "slight" evidence of these objective standards of reasonableness would appear to be insufficient to justify a rational factfinder finding for the defendant, and therefore insufficient to warrant the giving of a compulsion instruction. See *Hernandez*, 253 Kan. at 710-711 (defense-of-another required defendant's belief be reasonable; trial court correctly refused to give requested instruction because rational factfinder could not find that defendant acted in defense of his sister when he shot victim).

Accordingly, we clarify that our standard for reviewing a trial court's refusal to instruct on defendant's theory of defense is as follows:

"A defendant is entitled to instructions on the law applicable to his or her theory of defense if there is evidence to support the theory. However, there must be evidence which, viewed in the light most favorable to the defendant, is sufficient to justify a rational factfinder finding in accordance with the defendant's theory."

With this clarification, all contrary holdings of this court are disapproved. As with any issue, the evidence of the defendant's theory of defense certainly can be supported only by his or her own testimony.

With this clarification of our standard, we now turn to the facts and arguments of the instant case.

Anderson argues that the facts show he feared Bryant would injure him if he did not do what he was told. He points out that immediately before Bryant told Anderson to help him obtain Gus' money, Anderson had seen Bryant hit Gus in the head with a bottle. He then realized Bryant could use the same bottle to attack him. Anderson also calls our attention to Bryant's aggressive tone of voice. He testified:

"Q. The last thing you said basically was that you turned around, or you looked over your shoulder or something, and you saw Tim [Bryant] strike Gustavo in the head; correct?

"A. Yes, sir.

"Q. *Do you know for sure what he struck him in the head with?*

"A. *I seen something clear in his hand, and that's what the gin bottle was made out of. It was glass.*

"Q. What happened?

"A. He hit Gustavo, and Gustavo fell. And I asked, what are you doing. *He said, help me get his money. And when he said it, he said it in a way like a—an aggressive way. So I got scared because I didn't know if he was going to hit me or not, so I went through the man's pockets.*

"Q. *Okay. Why did you go through his pockets, Walter?*

"A. *Because I thought he might hit me, too.*

.  .  .  .

"A. I proceeded to go through his pockets, but I didn't find nothing. [Bryant] was going through the pockets. I did give [Bryant] his wallet, and that's when [Bryant] told me, keep looking. And—

"Q. How did he say that to you?

"A. He told me, keep looking, and I went—and as I went—proceeded to go through Gustavo's shoes and socks." (Emphasis added.)

Anderson also recites the facts from the compulsion case of *Hunter*, 241 Kan. 629, and suggests that he was likewise entitled to such an instruction. However, he does not attempt to draw parallels between the facts of both cases. He essentially only references *Hunter* to establish that compulsion is a defense to felony murder because it is a defense to the underlying felony.

Anderson additionally points to the trial court's statement when denying his request for the compulsion instruction: *"Other than his testimony,* there is nothing in his actions that evening that would support his contention in this Court's opinion that he was under a compulsion to aid and abet in the commission of the act

of aggravated robbery." (Emphasis added.) He argues the italicized language proves that, contrary to Kansas law, the trial court ruled that a defendant's testimony alone is insufficient to support the instruction. See *Bell*, 276 Kan. at 792 (compulsion evidence can be supported even if only by defendant's own testimony). While this component of *Bell* remains intact for our standard of review, it is not dispositive of the issue as Anderson argues. A review of the trial court's comments in context reveals the court found that Anderson's testimony describing the episode theoretically could have been sufficient, but practically its content was not:

"Well, I listened intently to the defendant's testimony in this case, and I've read the statute involving compulsion, and that's 21-3209. I have read the PIK instruction on compulsion, and I have read some of the caselaw suggested by those sources. And to the best of my ability to discern the meaning or intent of that instruction, *your client's testimony fails to meet the threshold issue. The fact situation, as testified to by your client, at no time that evening did the codefendant threaten him physically, verbally in any way.* In fact, the apparent one act of aggression occurred between the codefendant and the victim.

"The threat, whether there was one or not, appears to be purely speculative on behalf of your client. There is no direct evidence of the same. There is no direct evidence of an imminent threat to use force against his person if he did not comply." (Emphasis added.)

The trial court then concluded that not only was Anderson's testimony insufficient to warrant the instruction, but his actions were also, *i.e.*, all of his evidence was inadequate:

"*Other than his testimony, there is nothing in his actions that evening that would support his contention* in this Court's opinion that he was under a compulsion to aid and abet in the commission of the act of aggravated robbery, and that is the going through the pockets of the fallen Gustavo." (Emphasis added.)

Anderson next argues that these same trial court comments reveal that it erred in requiring an explicit threat of harm by Bryant toward Anderson. He cites *State v. Moore*, 269 Kan. 27, 4 P.3d 1141 (2000), in support. *Moore*, however, was a robbery case in which compulsion was not an issue. *Moore* only makes the point that a threat does not have to be explicit to meet the requirement for robbery. 269 Kan. at 33. Additionally, *Moore* involved a stranger's threat to the victim. Here, by contrast, the alleged threat was from a man who had been known to the other man for 3 years.

We now turn to the State's response to the heart of the compulsion issue: whether the evidence was sufficient to warrant the instruction. Specifically, did Anderson rob Gus under the compulsion or threat of the imminent infliction of death or great bodily harm, *i.e.*, did he reasonably believe that it would be inflicted upon him if he did not help Bryant?

The State argues that Anderson did not know whether Bryant would hit him also and that there was never any real threat directed at Anderson. It points out that Anderson asked Gus for money so Anderson could give it to Bryant and Bryant would then leave Gus alone.

The State also points out that Anderson did not mention the threat allegation until trial. He never told the police he went through Gus' pockets because he was threatened by Bryant. Rather, according to Anderson's videotaped statement, Bryant merely "asked" him "to help him go through" Gus' pockets; Bryant "asked me to help him get the money out and which I proceeded to do that." The State emphasizes that when asked by police at the end of the interview if there was anything that Anderson wanted to add, he said "no sir" and never mentioned feeling pressured to commit the crimes.

The State also draws our attention to the fact that Anderson simply walked away when he had finished going through Gus' pockets. On cross-examination, Anderson admitted that he finally left "because it wasn't right" and Bryant did nothing to stop him from leaving. The State points out that Bryant immediately followed and argues that the doctrine of compulsion cannot be invoked by one who had a reasonable opportunity to withdraw or avoid doing the act. *Matson*, 260 Kan. at 385.

The State further points out that Anderson and Bryant straight-away bought a $20 piece of crack cocaine and got high together right after the purchase. Although this evidence relates to conduct after the crimes, Anderson's counsel at oral arguments conceded that it could be considered in the compulsion calculus. We agree. See *Myers*, 233 Kan. at 614-15 (court observed that after crime, defendant made no attempt to check on family which had allegedly been threatened with harm); *cf. State v. Sanchez-Cazares*, 276 Kan.

451, 459, 78 P.3d 55 (2003) (circumstances which may give rise to the inference of premeditation include " 'the defendant's conduct before and after the killing' "). Accordingly, as the State argues, we can also consider that Anderson chose not to report the crimes that he had been allegedly compelled to perform—particularly when he noticed police at the crime scene just minutes after his involvement. See *Myers*, 233 Kan. at 615-16 (court observed that defendant made no attempt to notify authorities after crime so cofelon could be apprehended).

We agree with the State. Under our facts, no rational factfinder could have found that Anderson had a reasonable belief that death or great bodily harm would be inflicted upon him by Bryant if he did not cooperate in the robbery.

A rational jury would have great difficulty accepting Anderson's counsel's characterization of an approximate 2-minute compulsion, sandwiched between two lengthy periods of free will. According to counsel, Anderson essentially exercised his free will the entire night until the moment Bryant struck Gus with a bottle and ordered Anderson to search Gus for money. Under counsel's characterization, the compulsion that began at that point ended—and free will essentially reappeared—about 2 minutes later, when Anderson stopped searching Gus for money and left "because it wasn't right." Clearly, recognizing it "wasn't right" could have been accomplished at any time, including when Bryant first told Anderson in an "aggressive way" to search Gus for money.

Anderson's theory of compulsion to commit the robbery under his reasonable belief of imminent infliction of death or great bodily harm is further greatly undercut by his own testimony that he and Bryant basically left the crime scene together; that he left voluntarily without any Bryant efforts to stop him; that they went straight to a nearby drug supplier and bought crack cocaine; and that they immediately shared the drug and got high together.

Finally, our rejection of Anderson's theory is well supported by the quadruple homicide case of *Oliver*, 280 Kan. 681. There, defendant Oliver testified that when he, Earl Bell, and a third man arrived at Raeshawnda Wheaton's house, he and Wheaton went into the bedroom to talk. Oliver thought he heard gunshots but did

not think anything of it. He then saw house occupant Odessa Ford stumble.

When Oliver returned to the living room, Bell was holding a gun and told him to check occupant Jermaine Levy, whose body was upright on the floor with two gunshot wounds to the head and neck. Oliver complied, apparently pulling out one of the pockets and looking for money. Bell then entered the bedroom and shot Wheaton multiple times. Oliver said he was too frightened to run. He testified he did not inform police that Bell had committed the crimes because he " 'just [didn't] tell on people.' " 280 Kan. at 687.

Oliver argued that when the evidence was viewed in the light most favorable to him, it showed he did not know that Bell was planning to rob anyone at the time he agreed to cooperate with Bell; that Oliver checked Levy's pocket only under duress; and that Bell was holding a gun and directing his actions. He argued he was afraid his life would be in danger if he did not comply with Bell's directions.

The *Oliver* court upheld the refusal to instruct even under our former, lower standard of "slight evidence" in support of Oliver's compulsion theory. We acknowledged that while there was some minimal evidence that he was under the influence of Bell, there was no evidence supporting the degree of compulsion necessary to merit an instruction on that defense. 280 Kan. at 707.

In light of our holding, we need not consider the State's other arguments, *e.g.*, that compulsion is not available because Anderson willfully or wantonly placed himself in a situation in which it was probable that he would be subjected to compulsion or threat. See K.S.A. 21-3209(2).

Issue 2: *The trial court did not commit reversible error in allowing witnesses to testify about what Gus had expressed at the crime scene.*

Next, Anderson argues that his confrontation rights under the Sixth Amendment to the United States Constitution were violated when the trial court admitted into evidence communication made at the scene by the decedent, Gus, to Miguel, the interpreter. Anderson argues that Miguel should not have been allowed to testify

about what Gus expressed to him, nor should law enforcement have been allowed to testify about what they learned from Gus via Miguel. See *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004).

Anderson acknowledges that while he objected on hearsay grounds at trial, he raises the confrontation issue for the first time on appeal, which generally precludes our review. See *State v. Denney*, 278 Kan. 643, 651, 101 P.3d 1257 (2004) ("[W]here constitutional grounds are asserted for the first time on appeal, they are not properly before the appellate court for review."). He contends our consideration of the issue is necessary to prevent the denial of his fundamental rights. See *State v. Kirtdoll*, 281 Kan. 1138, 1149, 136 P.3d 417 (2006) (exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal include consideration of the theory is necessary to prevent denial of fundamental rights).

The State responds that the issue of the testimony admissibility was not properly preserved and should not be considered under any exception. It points out that Anderson not only failed to raise the confrontation issue below, but also that he failed to object on any grounds to the testimony of several officers, contrary to our contemporaneous objection rule contained in K.S.A. 60-404; see also *Kirtdoll*, 281 Kan. 1138, Syl. ¶ 7 ("As a general rule, a party cannot raise an issue on appeal where no contemporaneous objection was made and where the trial court did not have an opportunity to rule.").

The State further argues that even if we overlook Anderson's threshold problems and consider the confrontation issue, and even if we then conclude that the court admitted Gus' communications through Miguel and police testimony in violation of the Confrontation Clause, then the error is harmless. Assuming any error exists, we agree it is harmless, which reduces our analysis to that single issue.

Anderson does not specify which statements he is challenging. The State, however, identifies four instances in which this evidence was introduced at trial: the testimony of Miguel, and officers Bundy, Sillings, and Allen.

Miguel testified that he asked Gus who did this to him: Gus lifted up two fingers. Officer Bundy testified that Miguel told him that Gus "was attacked by two black males who had beat him up and taken his billfold." Officer Sillings similarly testified that Miguel interpreted for Gus, who said that two males had hit him really hard and taken his money. Officer Allen testified that his report reflected that based upon Gus' statements, the suspects were described as two black males.

As the State points out, there are several factors to consider in determining whether a violation of the Confrontation Clause is harmless:

"Violation of the Confrontation Clause is subject to analysis under the federal harmless error rule. The correct inquiry is whether . . . a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, and, of course, the overall strength of the prosecution's case." *State v. Nguyen*, 281 Kan. 702, Syl. ¶ 6, 133 P.3d 1259 (2006).

In examining the magnitude of the assumed error pursuant to the *Nguyen* guidelines, we begin by considering Anderson's own statements. He admitted during his videotaped statement, which was played to the jury, and during his testimony at trial that he aided and abetted the commission of aggravated robbery—the underlying felony for the felony murder. In particular, he admitted that after Bryant struck Gus in the head with a gin bottle, he went through Gus' pockets looking for money. He then turned over Gus' wallet to Bryant. For the same reason, he removed Gus' shoes and socks.

Because it was uncontroverted that Gus' death occurred from the commission of this inherently dangerous felony, Anderson's own admissions also proved that he committed felony murder. See K.S.A. 21-3401 ("Murder in the first degree is the killing of a human being committed: . . . (b) in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined

in K.S.A. 21-3436 and amendments thereto."); K.S.A. 21-3436(a) ("Any of the following felonies shall be deemed an inherently dangerous felony . . . [4] aggravated robbery, as defined in K.S.A. 21-3427."); and K.S.A. 21-3427 ("Aggravated robbery is a robbery . . . committed by a person who . . . inflicts bodily harm upon any person in the course of such robbery."). The objectionable testimony of the other witnesses was primarily corroborative of Anderson's admissions. See *Nguyen*, 281 Kan. 702, Syl. ¶ 6 (consider importance of offending witnesses' testimony in prosecution's case, overall strength of its case, and whether testimony cumulative).

Under these circumstances, we must also reject Anderson's position at oral argument that Gus' inadmissible communication suggesting that two people actually struck him, versus only Bryant striking him and Anderson merely robbing him, had any likelihood of changing the result of the trial. See *State v. Walters*, 284 Kan. 1, Syl. ¶ 6, 159 P.3d 174 (2007) (under federal constitutional error standard, error harmless beyond a reasonable doubt when it had little, if any, likelihood of having changed the result of the trial).

Issue 3: *The trial court did not commit reversible error in its instruction on presumption of innocence.*

Finally, Anderson argues that the trial court erred in instructing the jury that it was to presume he was not guilty "until" it was convinced beyond a reasonable doubt that he was guilty and not "unless" it found him guilty. The State agrees that the wrong instruction was given but argues that the error is not clearly erroneous.

Both parties agree that because Anderson did not object to the instruction at trial, the appropriate standard of review is clear error. See K.S.A. 22-3414(3). Instructions are clearly erroneous " ' "only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." ' [Citations omitted.]" *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125 (2006).

The trial court instructed the jury:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty *until* you are convinced from the evidence that he is guilty.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty." (Emphasis added.)

Anderson argues that the proper instruction, as reflected in PIK Crim. 3d 52.02, is instead: "The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty *unless* you are convinced from the evidence that he is guilty." (Emphasis added.)

This court recently discussed the identical argument in *State v. Gallegos*, 286 Kan. 869, 875-78, 190 P.3d 226 (2008). There, the court rejected the defendant's argument for two reasons. First, it noted that it had previously held that this instruction does not rise to the level of reversible error. 286 Kan. at 871-77. Second, the court held that Gallegos had invited error by requesting the instruction he sought to challenge on appeal. 286 Kan. at 877.

It is unclear whether Anderson requested the offending instruction which would provide application of the invited error doctrine. However, the *Gallegos* court's first basis for rejecting the argument is sufficient here. That court reiterated the rationale from *State v. Wilkerson*, 278 Kan. 147, Syl. ¶ 7, 91 P.3d 1181 (2004). There, "the defendant claimed that the use of the term 'until' rather than 'unless' misled the " 'jury into believing that [it] should expect to be convinced of the defendant's guilt.' " 278 Kan. at 158." *Gallegos*, 286 Kan. at 877. Both the *Gallegos* and *Wilkerson* courts noted that the instruction should have used the word "unless" instead of "until," but neither court determined that the error warranted reversal. They also emphasized that the instructions, when read as a whole, accurately stated the law, so that the jury could not reasonably have been misled by them. *Gallegos*, 286 Kan. at 877; *Wilkerson*, 278 Kan. at 158.

Anderson has not presented any new facts or law that merit reconsideration of this issue. Consequently, the use of the outdated instruction did not constitute clear error.

Affirmed.