MODIFIED OPINION[1]

NOT DESIGNATED FOR PUBLICATION

No. 127,068

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DRAVEN LYNN MCDOWELL,
*Appellant.*

MEMORANDUM OPINION

Appeal from Miami District Court; AMY L. HARTH, judge. Submitted without oral argument. Original opinion filed May 8, 2026. Modified opinion filed June 5, 2026. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., ARNOLD-BURGER and SCHROEDER, JJ.

PER CURIAM:  A jury convicted Draven Lynn McDowell of aggravated battery and criminal restraint following a joint trial with his father, Casey Stephen McDowell. Draven appeals, arguing that the district court violated his right to present a complete defense by refusing to instruct the jury on self-defense. He also claims the district court

---

[1] **REPORTER'S NOTE**:  Opinion No. 127,068 was modified by the Court of Appeals on June 5, 2026, in response to the Appellant's motion for rehearing/modification filed May 20, 2026. The modified language was added to slip op. at 11-14.

1

improperly ordered him to register as a violent offender under the Kansas Offender Registration Act (KORA). Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Another panel of our court recently decided Casey's appeal from his convictions, in *State v. McDowell*, No. 127,361, 2026 WL 252907 (Kan. App. 2026) (unpublished opinion). For consistency, and because the same facts are shown in our record, we adopt that panel's recitation of the facts:

"*The McDowells and Ballard, a trash collector, had a hostile relationship that led to the McDowells attacking Ballard on his route.*

"On October 8, 2020, Casey and Draven McDowell (McDowells), father and son, lived in a neighborhood in Miami County where Terry Ballard worked for L&K Waste Management as a trash collector and drove a trash truck. For reasons that are not important to this appeal, Casey and Ballard had a history of disagreement and tense confrontations.

"The altercation at the heart of this case began when Draven drove a dirt bike directly in front of Ballard's truck, stopped, and acted like the bike had run out of fuel. The McDowells and Ballard then had a series of interactions involving Casey's four-wheeler, Draven's dirt bike, and Ballard's truck that culminated with Draven and Casey trying to open the door to Ballard's truck.

"Draven then tried to climb into the cab of the truck, so Ballard kicked Draven trying to knock him out of the cab. Casey grabbed both of Ballard's legs, pulled him sideways in his seat, and tried to pull him out of the cab.

"After Casey held Ballard's legs, Draven climbed into the truck and repeatedly punched Ballard's face and head for several minutes. At the same time, Ballard reached down and punched the gas pedal, hoping Draven would leave in response. The truck started moving but Draven continued hitting Ballard. Ballard eventually grabbed Draven by his throat. The truck moved around 50 yards throughout the fight and ultimately stopped in a ditch. Draven then got out of the truck. According to Ballard, Draven's dirt bike was '[w]added up in a ball underneath the truck' by the time the truck stopped.

"Three officers were dispatched to the scene. Casey and Draven both claimed to law enforcement that Ballard was the aggressor and agreed that Casey held Ballard's legs. Casey claimed that he held Ballard's legs to stop Ballard from kicking Draven.

"*Draven and Casey were found guilty at a joint jury trial.*

"The State initially charged Casey and Draven in separate complaints. . . . But . . . the trial court granted the State's request to consolidate the cases for a joint jury trial over Casey's and Draven's objection.

"At trial, the jury heard testimony from Ballard and two law enforcement officers, viewed law enforcement body cam videos, and viewed 10 video clips from Ballard's dash cam relating to the altercation. Based on that evidence, the State argued, among other things, that Casey and Draven were the aggressors and were harassing Ballard as he simply 'tr[ied] to do his job.' It likened Casey and Draven to 'schoolyard bullies,' who worked together to hurt Ballard—a conspiracy between codefendants. Neither Casey nor Draven testified, but Casey attempted to minimize his involvement, arguing among other things that he intervened between Ballard and Draven to prevent harm and property damage. The jury found both Casey and Draven guilty of aggravated battery and criminal restraint." 2026 WL 252907, at *1-2.

The district court sentenced Draven to concurrent sentences of 13 months in prison and 12 months in jail. The district court then suspended that sentence, granted Draven probation, and ordered Draven to serve 30 days in jail before beginning probation.

Draven timely appeals.

## I. DID THE DISTRICT COURT ERR BY NOT INSTRUCTING THE JURY ON SELF-DEFENSE?

Draven first claims that the district court's refusal to give the jury a self-defense instruction violated his right to present a full and complete defense.

*Standard of Review and Basic Legal Principles*

Appellate courts review de novo a claim that a district court's ruling has interfered with a defendant's right to present a defense. *State v. Waldschmidt*, 318 Kan. 633, 657, 546 P.3d 716 (2024); *State v. Maestas*, 298 Kan. 765, 780, 316 P.3d 724 (2014). But the fundamental right to a fair trial is "subject to statutory rules and caselaw interpreting the rules of evidence and procedure." 298 Kan. at 781 (citing *State v. Wells*, 289 Kan. 1219, 1235, 221 P.3d 561 [2009]).

We follow a multi-step framework when addressing instructional error issues. First, we consider whether the issue is reviewable, i.e., whether there is appellate jurisdiction and whether the issue is sufficiently preserved for appellate review. Second, we decide whether the challenged instruction was legally and factually appropriate. In doing so, we exercise unlimited review of the entire record and view the evidence in the light most favorable to the requesting party. Third, we determine whether any instructional error requires reversal or can be considered harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021).

*Draven preserved the issue.*

Draven requested self-defense instructions before and at trial. At trial, Draven moved for a judgment of acquittal, arguing the uncontroverted evidence showed Ballard was the initial aggressor. The State countered that the evidence more accurately indicated that Draven was the initial aggressor because he climbed onto the truck and opened the driver's side door of Ballard's trash truck.

The district court proceeded to the jury instruction conference shortly after this discussion. While addressing Draven's request for the two self-defense instructions, the

4

parties returned to the issue of whether Draven or Ballard was the initial aggressor. Each argued that the facts showed the other was the initial aggressor.

After some discussion, the district court focused on the fact that Draven admittedly opened Ballard's side door to ask him what he was going to do about his damaged bike. Although Ballard delivered the first physical blow—a hard kick to Draven's face—he did so to protect himself. Draven then reengaged the fight and started beating Ballard, repeatedly punching Ballard's head while his seat belt was on.

These facts show that Draven requested the instruction, and the parties argued the factual bases for their respective positions on this issue in fair depth. The issue is thus appropriately preserved for appellate review.

*The instructions are legally appropriate.*

Self-defense is an affirmative defense that the accused may use to justify actions that otherwise would constitute the charged crime. *State v. Haygood*, 308 Kan. 1387, 1406, 430 P.3d 11 (2018). "A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies." K.S.A. 21-5108(c); *State v. Keys*, 315 Kan. 690, 714, 510 P.3d 706 (2022).

K.S.A. 21-5222(a) provides that a person is justified in using force against another "when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." Citing this provision, Draven broadly argues that his requested instructions—PIK Crim. 4th 52.200 (self-defense) and PIK Crim. 4th 51.050 (State's burden of proof to disprove self-defense)—were legally appropriate.

5

The State does not challenge the legal appropriateness of the instructions. We find them legally appropriate. K.S.A. 21-5222(a) provides broad legal authority for giving the instruction. This court has also previously recognized that a self-defense instruction can be legally appropriate when aggravated battery is the offense charged. See, e.g., *State v. Ulmer*, No. 114,315, 2016 WL 7428362, at *4 (Kan. App. 2016) (unpublished opinion). Thus, as often repeated in similar appeals, "[t]he key question is whether a self-defense instruction was factually appropriate in this case." *State v. Butler*, 321 Kan. 493, 514, 581 P.3d 1261 (2026).

*The instructions are not factually appropriate.*

A criminal defendant is generally entitled to instructions on the law applicable to his or her theory of defense if sufficient evidence, viewed in the light most favorable to the defendant, would lead a rational factfinder to find for the defendant on that theory. See K.S.A. 21-5108(c); *State v. Wimbley*, 313 Kan. 1029, 1033-35, 493 P.3d 951 (2021). A self-defense instruction should be given if the facts presented at trial, viewed in a light most favorable to the defendant, show that the defendant honestly believed force was necessary to defend himself from imminent bodily harm and that a reasonable person in the same circumstances would have come to the same conclusion. See K.S.A. 21-5222(a).

The State asserts that an instruction on self-defense was not factually appropriate here for three reasons. First, self-defense is not available to a person trying to commit a forcible felony, such as aggravated battery. Second, initial aggressors are generally precluded from presenting the self-defense justification. See K.S.A. 21-5226(a), (c). And third, a self-defense instruction is generally not appropriate when the facts show the parties engaged in mutual combat. See *Butler*, 321 Kan. at 514-16 (citing cases and finding self-defense instruction not factually appropriate when the evidence showed

6

defendant and victim engaged in mutual combat and defendant reengaged after victim had already turned to leave).

We focus, as the district court did, on facts showing who the initial aggressor was. Draven counters that "there was no evidence that Draven provok[ed] . . . Ballard by jumping off his new $4,200 motorcycle in front of a 26,000-pound trash truck, or that he . . . provok[ed] . . . Ballard to boot-kick him by opening the truck's door." But shifting the focus to Draven's asserted lack of provocation does not show that Ballard was the initial aggressor.

Draven also contends that in deciding this issue as a matter of law, the district court improperly resolved conflicting facts that should have been submitted to the jury, suggesting that the jury might have determined that Ballard, not Draven, was the initial aggressor. Draven relies in part on the instructional error analysis in *State v. Williams*, No. 107,366, 2014 WL 274455 (Kan. App. 2014) (unpublished opinion). There, this court noted that the defendant's theory of defense can be supported solely by the defendant's own testimony as long as a rational finder of fact—viewing the testimony in a light most favorable to the defendant—would be justified in finding in accordance with that theory. 2014 WL 274455, at *7; see *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008). The *Williams* panel determined that the jury should have been instructed on self-defense because the facts were close enough that reasonable minds could disagree on the appropriate answer. But the panel also found that the evidence could reasonably show that the defendant was the initial aggressor. And the panel recognized the appropriateness of an instruction telling the jury that if he were the initial aggressor, the defendant could not argue self-defense. *Williams*, 2014 WL 274455, at *10-12.

Draven cites the dissenting opinion in *State v. Lowe*, 317 Kan. 713, 538 P.3d 1094 (2023), to emphasize the importance of submitting close factual disputes to the jury. Draven quotes the dissenting opinion's recognition that juries provide a buffer between

government and the individual; they humanize the law and speak as the "'commonsense judgment of the community.'" 317 Kan. at 722-23 (Stegall, J., dissenting) (dividing on the issue of reversibility).

Still, we are not persuaded that reasonable minds could differ in deciding the issue here. Ballard testified at trial. Neither Casey nor Draven did, so their version of events is based on what officers recorded of their statements to them at the time. But when we consider the videos of the interactions, Ballard's testimony, and the evidence of Draven and Casey's version of events, the record shows clearly that Draven initiated the encounter.

We first review Ballard's testimony. Ballard testified that the second time Draven cut in front of him, Draven dropped his bike on the road a few feet in front of the truck. Ballard hit his brakes to stop, but given the nature of the truck, the vehicle did not stop immediately. When that happened, Draven ran over to the ditch next to the road and yelled, "'Oh my God, you almost ran me over.'" Draven raised his shirt, and Ballard saw something shiny in Draven's waistband, which he believed was a gun.

Draven then ran to the driver's side of Ballard's truck and tried to open the door. The truck did not have locks, so Ballard tried to hold the door closed. Casey ran over and helped Draven force the door open. Draven then began climbing up into the truck, so Ballard kicked Draven to try to knock him out of the truck. Casey grabbed one of Ballard's legs and pulled him sideways in his seat. But Ballard was wearing his seatbelt and had no way to get away from Casey and Draven. Ballard continued kicking until Casey gained control of both his legs and tried to yank him out of the truck.

When Casey restrained Ballard's legs, Draven climbed into the truck and repeatedly punched Ballard's face and head. This continued for a few minutes. Ballard then reached down and punched the gas pedal, hoping this would force Draven to jump

8

out of the truck. Yet even when the truck started moving, Draven continued hitting Ballard. Ballard eventually grabbed Draven by his throat and was able to get him out of the truck. The truck rolled for about 50 yards during the fight before it stopped in a ditch. Draven's dirt bike was "[w]added up in a ball underneath the truck" by the time the truck stopped. And when the truck stopped, Casey yelled "that's enough," and Draven walked back to his house. Ballard called his boss again, who reported the incident to the police.

We next review Draven and Casey's statements to the police, which were admitted into evidence. Draven told the officers that he was riding his dirt bike on the road and through the ditches when Ballard drove into the neighborhood. Ballard was speeding when he arrived and nearly hit Draven. Ballard may have mistaken him for his dad, whom Ballard did not get along with. After the near miss, Casey drove his four-wheeler to Ballard's truck. Ballard turned his truck around in the cul-de-sac at the end of the road and then sped up and tried to run Draven over. Draven got off his bike and went to Ballard's window to ask what he was going to do about the bike. Draven climbed onto the side of the truck, opened the driver's door, and then was kicked in the face from Ballard's heavy work boots. Ballard kicked him no less than 20 times throughout the ensuing fight. Ballard punched the gas pedal and as the truck rolled, started punching Draven. Then, once the truck came to a stop, Draven started punching Ballard, and Casey held Ballard's feet while this occurred. Draven claimed that his actions were "all self-defense at that point."

Casey alleged that after Ballard tried to hit Draven, Draven climbed into the cab of the truck to confront him. Ballard then started kicking Draven and a fight ensued. Casey then climbed onto the truck and held Ballard's legs to stop him from kicking Draven.

The dash camera videos are telling as to the events before the fight. They show that Draven drove up to Ballard several times and swerved in front of him at least twice before stopping his bike in the middle of the road, for no apparent purpose other than to

9

taunt him. Draven and Casey followed Ballard up and down the road and yelled obscenities at him, apparently trying to goad him into a fight.

Draven's choice to engage with Ballard by climbing onto Ballard's truck and opening the driver's door forced Ballard to have a close-up, face-to-face interaction with him. Draven's suggestion that he just wanted to talk to Ballard is not supported by the surrounding circumstances. Had that been his intent, Draven likely would not have forced open the truck door. And after the initial physical encounter in the truck, Draven chose to continue his battery of Ballard even though Ballard was restrained by his seat belt, Ballard was restrained by Casey, and the truck had begun moving.

Even crediting as true Draven and Casey's statements to the police officers, we cannot find that the facts of the record here are close enough that reasonable minds could find that Draven honestly believed the amount of force he used was necessary to prevent bodily harm to himself and that a reasonable person in the same circumstances would have come to the same conclusion. Draven could easily have walked or driven away from the trash truck had he believed he was at risk of imminent harm from Ballard. In contrast, Ballard could not have driven away from Draven, nor could he safely remain in his truck due to Draven's decision to forcibly enter it. Draven, as the initial aggressor, was not entitled to a self-defense instruction. See K.S.A. 21-5226. We need not determine whether that instruction was also inappropriate because the parties engaged in mutual combat, or because Draven tried to commit aggravated battery. The district court properly found the self-defense jury instruction was not factually appropriate. We thus affirm Draven's convictions.

10

II. DID THE DISTRICT COURT ERR BY ORDERING DRAVEN TO REGISTER AS A VIOLENT OFFENDER UNDER KORA?

Draven's second argument challenges the district court's order for him to register as a violent offender. KORA requires offenders deemed "violent" to register. See K.S.A. 22-4902(a)(2). Under K.S.A. 22-4902(e)(1)(H), a defendant convicted of criminal restraint is a violent offender, "except by a parent, *and only when the victim is less than 18 years of age*." (Emphasis added.)

Draven argues that a criminal restraint conviction is a predicate for a "violent offender" classification if: (1) the defendant is not a parent; and (2) the victim is under the age of 18. Because the district court did not make these findings, Draven argues he was not an offender under KORA.

The State counters that this argument is unpreserved, so it should be dismissed. If reviewed, the State asserts that Draven's argument is based on a statutory misinterpretation and his conviction rendered him an "offender" as a matter of law.

*Preservation*

We exercise "plenary review over whether an issue is properly preserved for appellate review." *State v. Daniel*, 307 Kan. 428, 429-30, 410 P.3d 877 (2018). Draven concedes that he did not raise this issue in the district court.

Typically, an appellate court does not consider an issue raised for the first time on appeal. *State v. Mendez*, 319 Kan. 718, 730, 559 P.3d 792 (2024). Yet we have recognized three exceptions to this general rule. See *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021) (listing exceptions). Even so, our Supreme Court has placed the procedural burden on a party raising a new issue on appeal to comply with court rules and

explain why the issue is properly considered. See Kansas Supreme Court Rule 6.02(a)(5) (2026 Kan. S. Ct. R. at 36); *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022). And even when an exception to preservation applies and the issue is amenable to resolution, an appellate court has discretion to choose not to consider an unpreserved claim. *State v. Unruh*, 320 Kan. 260, 264-65, 565 P.3d 825 (2025) ("[I]t is not enough for a party simply to assert an exception's existence. The unpreserved issue must be amenable to resolution on appeal, and even then, there is no obligation to consider it.").

Draven invokes one of these exceptions—an issue of law on undisputed facts. He contends that "[a]s a matter of law, the definition of 'violent offender' found in K.S.A. 22-4902 does not include a person convicted of criminal restraint unless the victim was 'less than 18 years of age.'" See K.S.A. 22-4902(e)(1)(H) (defining "'violent offender'" to include any person convicted of criminal restraint "except by a parent, and only when the victim is less than 18 years of age"). We agree with the State's assertion that Draven should have objected when the district court ordered him to register. Still, we accept Draven's invitation to review this new claim for the first time on appeal. See *Mendez*, 319 Kan. at 730-31; *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020).

In doing so, we follow well-established rules of statutory interpretation.

"Statutory interpretation presents a question of law over which appellate courts exercise unlimited review. The guiding principle of statutory interpretation is to give effect to the Legislature's intent whenever that intent can be determined. To discern that intent, our analysis begins with the statute's plain language, interpreting words according to their ordinary meaning. If the language is clear and unambiguous, courts should not look beyond the text or add meaning that does not appear in the statute. But if the statute's wording is ambiguous, we will consult canons of construction to resolve the ambiguity. *State v. Gomez*, 320 Kan. 3, 13, 561 P.3d 908 (2025)." *State v. Evans*, 322 Kan. 1, 3, 584 P.3d 646 (2026).

12

The statute Draven challenges is clear and unambiguous. The Legislature, using plain language, directed that a "'violent offender'" for purposes of registration includes a person convicted on or after a certain date of criminal restraint, "except by a parent, and only when the victim is less than 18 years of age." K.S.A. 22-4902(e)(1)(H). The plain language of this exception excludes from the definition of a violent offender a parent convicted of criminal restraint of a child less than 18 years of age. Draven invokes this exception, yet he does not contend that he is a "parent." Nor does he contend that the victim here was less than 18 years of age. Draven thus does not argue that he fits within the plain language of this exception.

Draven instead argues that this plain language interpretation of K.S.A. 22-4902(e)(1)(H) would lead to absurd results. For example, a parent would be required to register for 15 years if convicted of criminal restraint of their 48-year-old child who lives independently as a fully-functioning adult, but a parent convicted of criminal restraint of their dependent child younger than 18 (to whom they have a duty to care, etc.) would not. But this result seems most rational to us.

Criminal restraint involves knowingly and without legal authority restraining another person in a way that substantially interferes with that person's liberty. See K.S.A. 21-5411(a). Parents may knowingly restrain a child and substantially interfere with that child's liberty without committing violence because of the special relationship between a parent and child. In fact, society expects parents to do so—our common law imposes a duty on a parent to control their child. See *Williams v. C-U-Out Bail Bonds*, 310 Kan. 775, 789, 450 P.3d 330 (2019) (existence of a parent-child relationship may create a duty for the parent to control the conduct of the child, either to protect the child or third parties); *Estate of Kuebler v. Kansas Village at Old Town*, 66 Kan. App. 2d 535, 541, 589 P.3d 46 (2026) (special relationships, including those between a parent and child, can give rise to a duty to control the conduct of a child to prevent harm to others); Restatement (Second) of Torts § 316, comment c (1965) (a parent has the duty to exercise

13

reasonable care to control the child's conduct; "the very youth of the child is likely to give the parent more effective ability to control its actions and to make it more often necessary to exercise it").

Physically restraining a child to prevent harm to that child or to others may well be within the duty of a parent to exercise reasonable care to control their child's conduct. Yet because no legally recognized special relationship exists between parents and their adult sons or daughters, a parent's physical restraint of an adult child may warrant a different consequence. The parent-child exception in K.S.A. 22-4902(e)(1)(H) related to criminal restraint implicitly recognizes this difference. The State's plain language approach to this statute is thus not absurd. To the contrary, it makes good sense.

Draven's chief argument is that the district court erred by requiring him to register as a violent offender because the victim was over 18 years of age, and for almost 30 years, the Offender Registration Act has included criminal restraint as a registerable offense only if the victim is under 18 years old. He contends that K.S.A. 22-4902's legislative history shows that aggravated kidnapping, kidnapping, and criminal restraint traditionally required a finding that the victim was under 18 years old, but in 2011 the Legislature removed that requirement for kidnapping and aggravated kidnapping yet kept it for criminal restraint.

But Draven's argument ignores the plain language rule and invites us to rely on legislative history to determine intent. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the Legislature's intent. *Chalmers v. Burrough*, 314 Kan. 1, 8, 494 P.3d 128 (2021). Yet Draven makes no argument that the language of the exception is ambiguous. A writing is ambiguous only if a court is genuinely uncertain which one of two or more meanings is the proper meaning. *Greer v. Eby*, 309 Kan. 182, 192-93, 432 P.3d 1001 (2019). We have no uncertainty whatsoever here. And this court will not strain to find an ambiguity when,

14

in common sense, there is none. 309 Kan. at 193. Because we find the current version of the statute unambiguous, we affirm the district court's order that Draven register as a violent offender.

Affirmed.