# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 14, 2010 Session

## STATE OF TENNESSEE v. TED ORMAND PATE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-D-3508     Steve Dozier, Judge**

---

**No. M2009-02321-CCA-R3-CD - Filed November 22, 2011**

---

A Davidson County jury convicted the Defendant, Ted Ormand Pate, of attempted rape of a child, a Class B felony, and aggravated sexual battery, a Class B felony. The trial court merged the convictions and sentenced the Defendant as a Range I offender to ten years in the Tennessee Department of Correction. On appeal, the Defendant argues that the trial court erred when it: (1) admitted the Defendant's tape recorded confession to his daughter; (2) limited the scope of an expert witness's testimony regarding the Defendant's susceptibility to suggestion; and (3) disallowed the expert witness's testimony regarding the interview techniques used during the victim's forensic interview. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P.** 3 **Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. J.C. MCLIN, J., not participating.[1]

Mark C. Scruggs (at trial and on appeal) and Richard McGee (at trial) , Nashville, Tennessee, for the appellant, Ted Ormand Pate.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Sharon Reddick and Brian K. Holmgren, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

---

[1]The Honorable J.C. McLin died September 3, 2011, and did not participate in this opinion. We acknowledge his faithful service to this Court.

1

## I. Facts

On December 11, 2007, a Davidson County grand jury indicted the Defendant, Ted Ormand Pate, on two counts of rape of a child, Class A felonies, and one count of aggravated sexual battery, a Class B felony. The parties presented the following evidence at the Defendant's trial: The victim, M.E.H.,[2] testified that she was eight years old at the time of her testimony. She identified the parts of the female anatomy on a diagram referring to the vaginal area as "tee-tee" and the buttocks as "hiney." She testified that the Defendant was her "Pops,"a reference she used for her grandfather and that the last time she saw him was the day that he touched her. The victim said that, on the night she was assaulted, she was watching a movie in her younger brother's room, and the Defendant was in the room with her, and they were both on her brother's bed. She recalled that her parents were home. The victim testified that she was wearing pajamas and panties. She said that the Defendant pulled her pants down and touched her "tee-tee" inside and outside with his hand. He also touched her "hiney" on the outside. The victim testified that she might have told him to stop but she could not remember. She said that he did not stop until her mother walked by the room. The victim testified that her mother came into the room and took her into the bathroom. She said that her pants and panties were down when her mother came into the room, and she pulled her panties up. Her mother pulled her pajama pants up for her. While they were in the bathroom, the victim told her mother what happened. Thereafter, the victim's parents told the Defendant to leave, and he left. She remembered telling a counselor at school, named Rachel, and a woman named "Latoyla" [sic] about what happened. The victim testified that she was six or seven years old when this happened.

On cross-examination, the victim testified that she had a good relationship with the Defendant before this happened and that she loved him. She agreed that she and her siblings would sometimes spend weeks at a time with the Defendant and his wife. She said that the Defendant would lay down with her to help her go to sleep and that he would tickle her. The victim further agreed that she used to wear pull-ups to bed because she sometimes wet the bed at night, in part because she often had bladder infections.

About the assault, the victim said that she was under the bed sheets when the Defendant touched her, and she could not remember whether the Defendant was under the sheets or not. The victim said that she knew at the time the difference between good touches and bad touches, and she knew to tell her mother right away if anyone touched her in a private area. The victim agreed that when her mother took her to the bathroom, her mother was very upset and was crying. She further agreed that her mother asked her whether the

---

[2] It is the policy of this court to refer to minor victims by their initials.

Defendant had touched her "tee-tee." The victim said that she talked to her mother again the next day about what happened and that she talked to "LaToya" about it also. The victim also said that she had been to counseling and that she talked to "Jill" from the district attorney's office about her testimony.

On re-direct examination, the victim testified that her mother came into the bedroom because she saw that the victim's legs were spread open. The victim said that the Defendant pulled her legs apart with his leg. She testified that no one told her what to say on the stand.

The victim's mother, M.H.,[3] testified that the Defendant was her father and that M.E.H. was the oldest of her four children. M.H. testified that the Defendant and her mother divorced when she was very young, and the Defendant had full custody of her and her brothers. After the Defendant remarried, his wife, Judy Pate, helped raise the children. M.H. said that the family lived in Birmingham, Alabama. The Defendant was a master sergeant in the Air National Guard until he retired. After he retired, he worked as a deputy sheriff and bounty hunter for a time. He also ran his own business remodeling homes. M.H. said that she and her husband lived in Birmingham, Alabama, for two years, during which time they were very close to the Defendant. She said that the Defendant kept M.E.H. on the weekends.

By September 2007, M.H. and her husband had moved to Nashville, Tennessee, with their children while the Defendant still lived in Birmingham. M.H. explained that the Defendant was traveling for work through Nashville on the way to Indianapolis, Indiana, and stopped at their house to visit on September 30, 2007, when this event occurred. She said that the Defendant arrived at their house at 6:30 p.m. The family had supper together, and the Defendant helped M.E.H. finish her homework. At either 9:00 or 9:30 p.m., M.H. told M.E.H. that it was time for her to go to bed. The Defendant "offered to help her get ready for bed . . . lay down with her and get her to sleep, like he normally does." M.H. testified that, until that point, they had a pleasant visit.

M.H. testified that M.E.H. put on her pajamas and told her that she was ready for bed. M.H. said that she had just put down M.E.H.'s seven-month-old sister in the room that the girls shared, so she had M.E.H. and the Defendant go into her son's room. She explained that M.E.H. and the Defendant would often laugh and talk, and she did not want them to awaken the baby. M.H. recalled that her husband was in their bedroom, and she was cleaning the kitchen and doing laundry. She testified that M.E.H. got under the covers, and

_____

[3] In order to further protect the identity of the victims, we also will refer to the victims' mother and father by their initials.

3

the Defendant laid down next to her. The light was off in the bedroom, but the night light was on and the kitchen light shone into the room. M.H. recalled that she walked by the room at one point and told them to "calm down" because they were loud and M.E.H. needed to go to sleep.

M.H. testified that, when she walked by the room again, fifteen to twenty minutes later, the comforter was off of the bed, and both M.E.H. and the Defendant were under the sheets. She could tell that M.E.H.'s legs "were spread open" and that the Defendant's hands were underneath the sheets. M.H. testified that she walked into the room, turned on the light, and asked, "'What's going on here?'" She said that the Defendant responded, "'I would never do anything to hurt your daughter.'" M.H. testified that she pulled the sheets back and saw that M.E.H.'s pajama pants and underpants were pulled down around her ankles. She asked M.E.H. what happened, but M.E.H. would not answer. She took her to the bathroom and pulled her pants up. M.H. said that she either asked M.E.H. while in the bathroom, "'What happened? What did Pops do to you?' or 'Did he do anything to you? Why were your legs spread open?'"

M.H. testified that M.E.H. told her "that Pops touched her in a bad place and that he told her not to tell or that he would be mad at her and he'd get in trouble." M.H. asked her what she meant by "the bad place," and M.E.H. "said that he touched her tee-tee." M.E.H. told her mother that the Defendant touched her on the "'front part and the back part, and he stuck his finger in the hole and it hurt.'" M.H. said that M.E.H. told her this information "automatically" after she asked her what happened. M.H. testified that she took M.E.H. into her and her husband's bedroom and told Y.H., her husband, that the Defendant had touched M.E.H. She said that she had to tell him several times because he did not understand at first. M.H. testified that she, her husband, and M.E.H. went into her son's bedroom, where the Defendant was still on the bed. Y.H. and M.H. asked him whether he had touched M.E.H., and the Defendant denied it. M.H. said that M.E.H. told the Defendant, "'Yes, Pops, you did. You pulled my pants down and you touched me and rubbed all over me.'" Y.H. asked the Defendant again whether he had touched M.E.H., and the Defendant again denied it. Y.H. asked the Defendant to leave, which he did.

M.H. testified that "that night there were two phone calls to [her] cell phone, where [the Defendant] had tried to call to reach me and explain what he did; and he was apologizing for what he did, pleading that [she would not] turn him in, call the police." She testified that he said, "'I didn't mean to touch your daughter. I didn't mean to hurt her.'" M.H. said that the phone company automatically erased the voicemail messages two weeks later despite her efforts to save them.

M.H. testified that she did not send M.E.H. to school on Monday, October 1, 2007. She did not think that M.E.H. was emotionally prepared to go to school, and she and her

4

husband spent the day considering what they would do.  M.H. said that she wanted to talk to the Defendant and hear his story before going to the police because she loved him and had trusted him.  M.H. called Judy Pate, the Defendant's wife, because she was concerned about the Defendant's "emotional state, because he kept calling and leaving messages on the phone, apologizing and . . . just in agony, pretty much, crying."  She said that Mrs. Pate did not know that anything had happened and had been worried about the Defendant because he did not answer her calls.  M.H. testified that she spoke with Mrs. Pate again on Monday evening after Mrs. Pate had spoken with the Defendant.  Mrs. Pate told her that the Defendant "said that he [did not want to] live and wanted to kill himself . . . [b]ecause [he was] as guilty as sin for what he did."

M.H. testified that she sent M.E.H. to school on Tuesday, October 2.  In M.E.H.'s class, they had "a talk about . . . people touching children in the wrong places."  M.E.H. told her teacher what the Defendant had done to her on Sunday night, and M.H. went to the school to talk to M.E.H.'s guidance counselor.  The guidance counselor told M.H. that she had to report it to the police, and an officer came to the school to take M.H.'s statement.  Detective Zoccola, Metropolitan Nashville police detective, later contacted her to schedule a forensic interview for M.E.H.  M.H. said that she was not in the room during the interview and had not told M.E.H. what to say.  She stated that M.E.H. told the forensic interviewer more details about what happened than M.E.H. had told her.

M.H. testified that Detective Zoccola asked her to make a controlled call to the Defendant to try to get the Defendant to admit what he had done.  M.H. agreed to make the call.  She explained that she wanted to hear the Defendant's story to compare it to what M.E.H. had told her, "so [she] could find the truth."  She said that she made the call and that in the beginning of the conversation, the Defendant was "inaudible" because "he was crying so much."  M.H. testified that the Defendant initially "denied the whole scenario" but quickly admitted to half of what happened.  She said that, by the end of the conversation, he had admitted to everything.  M.H. stated that the Defendant said that he did not want to live, and she believed that his primary concern was avoiding jail.

M.H. testified that the Defendant called her at home in March 2008.  He wanted to meet with her face-to-face to "work something out."  M.H. said that the Defendant wanted to meet in person to avoid her recording their conversation.  She testified that she did, in fact, record the phone conversation.

On cross-examination, M.H. agreed that M.E.H. had problems with bed-wetting and bladder infections.  She said that M.E.H. had seen a doctor five to six times for bladder infections.  M.H. recalled that M.E.H. did not have a bladder infection on September 30, 2007.  M.H. testified that she met with Detective Zoccola for approximately twenty minutes before she made the controlled call to her father.  She said that the detective instructed her

5

to "reassure [her] dad that everything was okay . . . and [that she] needed to get him in an emotional state[] where he could talk to [her]." She testified that Detective Zoccola told her to tell her father that they could "work it out" or they could "fix this" at any point that the Defendant became unresponsive or upset. She said that she believed that it would be her choice whether the State prosecuted the Defendant or not.

The victim's father, Y.H., testified that he had known the Defendant for nine and half to ten years. Y.H. testified that he had previously had a "fairly close" relationship with the Defendant. He said that he saw the Defendant on September 30, 2007, when the Defendant came to their house. The family had already eaten dinner, but the food was still out, so M.H. made a plate for the Defendant. Y.H. said that when it was time for the children to go to bed, he began getting ready for bed, also. He testified that he had been in the master bedroom for thirty to forty minutes when M.H. came into the room. He said that she was upset and told him that he "need[ed] to ask her dad to leave." M.H. explained that the Defendant "was touching [M.E.H.]." Y.H. testified that he was shocked. He went to his son's bedroom and found the Defendant lying in the bed. He asked the Defendant to leave, and the Defendant got out of the bed and began putting his shoes on in the dining room.

Y.H. testified that his wife and daughter came into the room, and M.H. asked the Defendant what he had done. The Defendant responded, "'I would never do anything to hurt your daughter.'" M.H. asked the Defendant why M.E.H.'s pants were pulled down, and the Defendant told her that M.E.H. had done that herself. Y.H. said that M.E.H. "spoke up and said, 'No, I didn't Pops.'" Y.H. said that the Defendant admitted he had pulled down her pants, but the Defendant said that "he was just scratching her." Y.H. testified that the Defendant left the house but that he called M.H.'s cell phone later that evening.

The last time the Defendant called Y.H. answered the phone and told the Defendant to stop calling. He testified that the Defendant cried on the phone and asked him not to call the police. The Defendant also said that he was sorry and that he would not have done anything to hurt M.E.H. Y.H. said that the Defendant left a long message on M.H.'s cell phone the following morning. In the message, the Defendant said that he wanted to kill himself "for what he had done." He testified that the Defendant's wife flew to Indiana, where the Defendant went after leaving M.H. and Y.H's house, to bring the Defendant home because she "was so upset by [the Defendant's] words." Y.H. testified that his wife and the Defendant had a telephone conversation while the case was pending. He said that he heard the conversation because M.H. had activated the speaker phone. During that conversation, the Defendant did not deny M.H.'s accusations and told them that he would tell them in person what he had done.

Jaha Martin, a licensed clinical social worker at the Our Kids Center ("Our Kids"), testified that she interviewed M.E.H. on October 8, 2007, to record her medical history. She

6

said that M.E.H. reported that she had a stomach ache after her grandfather touched her, and she had not had a bowel movement since then. M.E.H. reported "some itching[] when she urinate[d]." Ms. Martin testified that she asked M.E.H. why she was at Our Kids, and M.E.H. reported that she was there because her grandfather had touched her "in a bad place." Ms. Martin said that M.E.H. pointed to her vaginal area, which she called her "tee-tee." Ms. Martin testified that M.E.H. reported that her grandfather "rubbed [her 'tee-tee'] up and down" on the inside with his finger. M.E.H. also reported that he touched her "hiney."

Beverly Cotton, a nurse practitioner at Our Kids, testified that she conducted a physical examination of M.E.H. on October 8, 2007. As part of the examination, she took M.E.H.'s medical history from her mother, M.H. M.H. reported that M.E.H. was experiencing constipation and painful urination. She also reported that M.E.H. had experienced urinary tract infections in the past. Nurse Cotton testified that M.E.H. tested positive for a urinary tract infection on October 8. She explained that it was not possible to determine when M.E.H. contracted the infection. Nurse Cotton testified that the anal-genital portion of M.E.H.'s examination was normal. She said that she would not expect medical findings in a case where a child made allegations that someone rubbed her genital area with a finger.

Metropolitan Nashville Police Officer Mark Longmire testified that school personnel from Dodson Elementary School requested a police officer in September 2007, and he responded. He met with the school counselor, the principal, and the victim's mother. He made an offense report based on the information that M.H. gave him. He notified the Department of Children's Services and a sex-abuse detective of the allegations.

Metropolitan Nashville Police Detective David Zoccola testified that he became involved in the case when Officer Longmire contacted him. His part of the investigation was to approach the suspect. In this case, he asked M.H. to make a controlled call to the Defendant to attempt to get the Defendant to admit what happened. He said that he met with M.H. for twenty to thirty minutes prior to making the call. He told her to stay calm and "to put [the Defendant] at ease." Detective Zoccola testified that he suggested things for her to say and tailored questions based on what the Defendant said. He said that M.H. "said [a lot of] things on her own [and a lot of] things that [he] told her, asked her to say in her own words." He explained that he would make suggestions by writing them on paper during M.H.'s conversation with the Defendant.

The State played the recorded phone call between M.H. and the Defendant for the jury. During the call, M.H. told the Defendant to calm down, and she said, "We can fix this, Daddy." She stated that M.E.H. told her what happened and asked the Defendant to tell his version. The Defendant said, "I played with her with my finger. . . . I just massaged her." M.H. asked him whether he massaged M.E.H.'s clitoris and touched her vagina, and the

7

Defendant agreed that he did. The Defendant denied pulling M.E.H.'s pants down at first, but later in the conversation, he said that he pulled her pants down halfway.

On cross-examination, Detective Zoccola agreed that M.H. "misrepresented some things" in her conversation with the Defendant, "[s]ome through [the detective's] guidance, some on her own."

Judy Pate testified on the Defendant's behalf that she and the Defendant had been married for twenty-five years. He had three children, including M.H., prior to their marriage, and she helped raise the children. Mrs. Pate testified that she and the Defendant watched M.H.'s children many times. She said that M.E.H. had a habit of wetting the bed and wore "diaper pant[ies]" at night. She recalled one occasion when M.E.H. did not have on panties during the day, and she said that it was her understanding that M.E.H. had a "habit of taking her pull-up off and sleeping at night without the panties."

Mrs. Pate further testified that she called M.H. on October 1, 2007, just to talk because she did not know what had happened the night before. She said that M.H. told her that the Defendant had "put his finger touching [M.E.H.]'s private area." Mrs. Pate said that she was upset and hysterical about what M.H. told her. She testified that M.H. also said that she wanted the Defendant to apologize and "that if [the Defendant] would . . . just confess what he did, that [they] could keep it in the family." Mrs. Pate said that M.H. called her several times. She said that she called the Defendant and that her hysterics caused him to become hysterical. She told him, "[I]f she says we can just keep it in the family . . . even though I know you didn't do anything, just confess it, just to get the thing over with . . . [because] I'm scared that . . . you might go to prison." Mrs. Pate testified that the Defendant told her that he had been tickling M.E.H. and that there was a "possible chance his finger or his hand [might have] touched the private area, but he [did not] remember it, and if he did, it certainly [was not] in a sexual way." Mrs. Pate said that the Defendant hurt his back at work on October 1, and she flew to Indianapolis to make sure that he saw a doctor about his back and because he was upset. She did not believe that he was suicidal.

The Defendant testified that on September 30, 2007, he was traveling to Indianapolis, Indiana, for work, when he stopped in Nashville for the night. He had hotel reservations, but his daughter invited him to come to her family's house for supper. He said that he helped M.E.H. with her homework after he ate supper. At 10:30 p.m. or 10:45 p.m., M.E.H. asked him to lay down with her, and they laid down together and started watching a movie. He said that he was tickling her and they were "rassling" until M.H. asked them to quiet down so that they would not wake the baby. The Defendant testified that he rolled over on his side, facing the wall. He said that the next thing that he knew was the light coming on. He said that M.E.H. was "semi-sitting up with her legs up" under the covers, and M.H. "runs over and grabs the sheet and jerks it off of her[,] and . . . she starts pitching a fit and screaming and

8

hollering." He said that M.E.H. tried to stop her mother from pulling the sheet off of her, but when M.H. "jerked the sheets back," they saw that M.E.H. did not have her pants on.

The Defendant testified that M.H. picked up M.E.H. and asked him what he had done. He said that he told her that he had not done anything, and M.H. took M.E.H. into the bathroom. He stayed where he was until Y.H. came into the room and asked him to leave. He said that Y.H. and M.H. "accused [him] of fingering [his] granddaughter." The Defendant testified that he denied the accusations and was in shock. The Defendant said that Y.H. threatened him, and he decided to leave their house before there was a confrontation between him and Y.H. He went to his hotel, and he tried to call M.H.. He said that he did not leave any messages. The Defendant called her again the following morning but did not leave a message. He went to work Monday night and had an accident when the ladder he was on collapsed. He said that he hurt his back but did not see a doctor. The Defendant testified that his wife called him several times on Monday night and told him that M.H. was accusing him of "fingering" M.E.H. Mrs. Pate also told him that M.H. had said that if he would confess, then "everything would be fine, worked out with the family." The Defendant said that he confessed because he was under pressure and afraid of going to jail. He agreed that he told M.H. when she called on Tuesday afternoon that he had "fingered" M.E.H., but he testified that he was not telling the truth. The Defendant said that he told M.H. what she wanted to hear because he believed her when she said that "everything would go away." He said that he did not know why M.H. wanted him to confess to something that he had not done, but he said that she had emotional problems and could be "real stubborn."

Dr. Bruce Frumkin, a psychologist, testified that he evaluated the Defendant on March 15, 2008. As part of the evaluation, he interviewed the Defendant and Mrs. Pate and administered the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-3"); the Minnesota Multiphasic Personality Inventory, Second Edition ("MMPI-2"); the Sixteen Personality Factor Tests ("16-PF"); and the Gudjonsson Suggestibility Scales ("GSS"). Dr. Frumkin testified that WAIS-3 revealed that the Defendant had low-average to average intelligence and that the Defendant "tends to misconstrue and misperceive at times some of the things that he . . . hears." He said that the MMPI-2 showed that the Defendant had a "6-7 profile," meaning that he is a person who is "extremely anxious" and easily hurt and embarrassed. Dr. Frumkin testified that the Defendant "got a high elevation on" the Naivete Scale portion of the MMPI-2. He said that people who have high elevations on the Naivete Scale "are extremely naive and have overly optimistic attitudes about things. . . . As a result, these people really try hard in conflicts with people."

Dr. Frumkin testified that the Defendant "got an extremely high score on the submissiveness subscale" of the MMPI-2, placing him "in the ninety-nin[th] percentile range compared to other people." He testified that the Defendant's 16-PF test revealed that he was more accommodating than ninety-five percent of the population, more submissive than

9

ninety-five percent of the population, and more socially timid than eighty-five percent of the population. Dr. Frumkin testified that these scores showed that the Defendant would "go along with what other people want him to do, want him to think, much more than the average person." He testified that the GSS was "designed to measure mainly interrogative suggestability," and the Defendant had a suggestibility score of twenty-seven, which was "in [excess] of the ninety-ninth percentile range compared to other people." Dr. Frumkin said that the Defendant's score was one of the highest scores he had seen, revealing that "this [was] an individual who [was] extremely vulnerable to being mislead when [given] misleading information or leading information."

Following the close of proof and deliberations, the jury found the Defendant guilty of the lesser-included charge of attempted rape of a child, a Class B felony, and aggravated sexual battery, a Class B felony. The jury found him not guilty of count two, rape of a child. The trial court sentenced the Defendant as a Range I offender to ten years at 30% for the attempted rape of a child conviction and to ten years at 100% for the aggravated sexual battery conviction. The trial court ran the sentences concurrently and merged the convictions. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant argues that the trial court erred when it: (1) admitted the Defendant's tape recorded confession to his daughter; (2) limited the scope of an expert witness's testimony regarding the Defendant's susceptibility to suggestion; and (3) disallowed the expert witness's testimony regarding the interview techniques used during the victim's forensic interview.

### A. Admission of Controlled Telephone Call

The Defendant argues that the trial court's admission of the recording of the controlled call between M.H. and the Defendant was erroneous. He claims that police coercion produced the Defendant's admissions and that the trial court should have suppressed the recording. The State responds that the Defendant waived the issue for failure to file a pretrial motion to suppress and for failure to object at trial. We agree with the State.

Tennessee Rule of Criminal Procedure 12 requires that parties file motions to suppress evidence prior to trial. Tenn. R. Crim. P. 12(b)(2)(C). Parties failing to comply with the rule waive the issue unless they show good cause. Tenn. R. Crim. P. 12(f); *see also State v. Zyla*, 628 S.W.2d 39, 41 (Tenn. Crim. App. 1981).

Here, the Defendant contends that Detective Zoccola perpetrated a fraud on the court because, at the preliminary hearing, M.H. claimed she acted on her own in using promises

10

of leniency but, at trial, Detective Zoccola testified that he took responsibility for any misrepresentations that M.H. made during the phone call to the Defendant. The Defendant argues that this fraud is good cause for this court to review the issue. Having reviewed the record, we cannot say that there is any inconsistency between the preliminary hearing and trial testimonies of M.H. and Detective Zoccola. The parties agree that M.H. deceived the Defendant during the controlled call by telling him that the police were not involved and that she told him, "We can fix this" and "We can work this out." At the preliminary hearing, M.H. stated, "I said that it could be worked out, but I didn't say that it would go away."

In Detective Zoccola's preliminary hearing testimony, he agreed with the defense counsel that M.H. "[led] the person who [was] being investigated to believe that if that person [would] just go ahead and tell[] her what she want[ed] to hear, then this [would] all be worked out." He also testified that as a government agent he could not make "deceptive representations" but that M.H. could. Detective Zoccola agreed that he could not make promises to the Defendant. At the trial, M.H. and Detective Zoccola testified that the detective gave her some guidance on how to proceed with the call and made some suggestions during the call. M.H. testified that Detective Zoccola suggested that she use the phrases "We can work this out" and "We can fix this." Detective Zoccola took responsibility for any and all of M.H.'s misrepresentations because he could not distinguish between his suggestions and what she said on her own. In our view, while their trial testimony was more elaborate and detailed than their preliminary hearing testimony, we fail to see how the testimonies are inconsistent. Detective Zoccola never made any representations at all to the Defendant during the controlled call because he did not say anything. The Defendant was unaware of the detective's involvement, and the detective never testified to the contrary. Detective Zoccola did not perpetrate a fraud on the court, and, therefore, the Defendant has not shown good cause for failing to file a pretrial motion to suppress the recorded phone call.

However, an error which has affected the substantial right of a defendant may be noticed at any time in the discretion of the appellate court where necessary to do substantial justice. *State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999). "Plain error" is recognized under Tenn. R. App. P. 36(b). *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Some errors are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

There are five factors which must be present for a court to determine "plain error" exists:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;

11

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (citing *Adkisson*, 899 S.W.2d at 641–42). Complete consideration of all five factors is unnecessary if at least one is absent. *Id.* at 283. Furthermore, the plain error must be such that it probably changed the outcome of the trial. *Adkisson*, 899 S.W.2d at 642.

In this case, the Defendant has not shown a breach of a clear and unequivocal rule of law. As this Court has previously observed, "[t]he United States Constitution provides no protection for those who voluntarily offer information to a confidant." *State v. Robert Bacon*, No. 03C01-9608-CR-00308, 1998 WL 6925, at *12 (Tenn. Crim. App., at Knoxville, Jan. 8, 1998), *no Tenn. R. App. P. 11 application filed.*. In *Robert Bacon*, the victim, at the behest of law enforcement, made a controlled call to the defendant, and the court acknowledged that the circumstances were deceptive but ruled that the circumstances did not "rise to the level of implicating notions of fair play as protected by the Fourteenth Amendment." *Id.* (citing *State v. Branam*, 855 S.W.2d 563, 568-69 (Tenn. 1993)). In *Branam*, the defendant made admissions to his aunt when she visited him in jail. *Branam*, 855 S.W.2d at 568. His aunt was participating in the police investigation and was wearing a recording device. *Id.* The *Branam* court found "no constitutional basis upon which to invalidate the defendant's inadvertent jailhouse confession." *Id.*

In this case, M.H. was participating in the investigation and was guided by law enforcement, and the Defendant made admissions to her without knowing that the police were recording the phone call. As in *Robert Bacon* and *Branam*, the Defendant misplaced his trust in a confidant who was also a police agent, but he was not coerced into confessing by a law enforcement official. Therefore, the Defendant has not shown a breach of a clear and unequivocal rule of law and, thus, cannot show that the trial court committed plain error by admitting the recorded conversation with M.H.

### B. Expert Testimony

The Defendant presents two challenges to the trial court's ruling regarding Dr. Frumkin's testimony. First, he contends that the trial court erred by limiting the scope of Dr. Frumkin's testimony. Specifically, he claims that the trial court should have allowed Dr. Frumkin "to 'connect' the results of his testing within the context of the interrogative setting established by the police when they directed his daughter to place a controlled or 'pretextual' phone call to her father.'" Secondly, he argues that the trial court erred by excluding Dr. Frumkin's proffered testimony about deficiencies in the victim's forensic interview and the "suggestive questioning" of the victim by her mother.

12

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, provided the scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue. Tenn. R. Evid. 702. An expert may base his or her opinion upon facts or data imparted to or perceived by the expert prior to or at a hearing; the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts. Tenn. R. Evid. 703. If the underlying facts or data lack trustworthiness, the court shall disallow expert testimony based upon them. *Id.* Evidence and expert testimony regarding scientific theory must be both relevant and reliable before it may be admitted. *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997).

The trial court has broad discretion in resolving questions concerning the qualifications, admissibility, relevance, and competency of expert testimony. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). An appellate court should not overturn a trial court's decision in admitting or excluding a proposed expert's testimony unless it finds the trial court abused its discretion. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn.1993). "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

## 1. Limitation of Testimony

The trial court held a hearing to determine the admissibility of Dr. Frumkin's testimony prior to trial. At the hearing, Dr. Frumkin testified about his evaluation of the Defendant, including the tests that he gave to the Defendant, the results of those tests, and the conclusions that he drew about the Defendant's personality. Dr. Frumkin stated, "If in fact he gave false statements to his daughter in that telephone conversation, . . . his psychological characteristics can help explain why he gave false statements if he really did not commit the offense." Following the hearing, the trial court found that "the data relied upon by Dr. Frumkin as to the conclusions regarding the Defendant are 'generally acceptable' by the relevant scientific community and are[,] therefore[,] of a type that is reasonably relied upon by experts in the relevant field." The trial court further found the following:

[T]he assessment as to whether the defendant is susceptible to making an inaccurate statement, the reliability of the defendant's statements to his daughter, taken together with consideration of the testimony proffered by Dr. Frumkin regarding the personality traits and mental condition of the defendant, is an issue that is within the common understanding of reasonable persons. Therefore, expert testimony regarding the credibility of the [D]efendant's

13

statement to his daughter is unnecessary and inadmissible. Dr. Frumkin cannot testify regarding whether the statements made to the [D]efendant's daughter were truthful or not.

The Court finds that Dr. Frumkin's testimony is admissible only as it specifically relates to the personality traits and mental condition of the [D]efendant; however, the Court finds that any testimony connecting the mental condition and personality traits of the [D]efendant to the issue of whether the [D]efendant has a propensity to make a false statement is inadmissible.

On appeal, the Defendant argues that Dr. Frumkin's testimony was critical to the Defendant's challenge of his statements to M.H.. The Defendant contends that he did not offer Dr. Frumkin's testimony for the purpose of opining whether the Defendant's statements to his daughter were true or false but states that "[h]is testimony [was] related to the mental condition of the Defendant and his *propensity to make a false statement within an interrogative setting*." He argues that the trial court should have allowed Dr. Frumkin to give "an analysis of the mental traits of the Defendant combined with the circumstances of the interrogation which could lead to an inaccurate statement" because, he submits, "the 'common understanding' of the citizen 'on the street' who ends up on the jury is that people do not falsely confess to crimes."

In Tennessee, expert testimony must "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702.

Where expert testimony is merely an iteration of what would be within the jurors' common sense, the admission of such evidence does not assist, much less substantially assist, the trier of fact to understand the evidence or determine a fact at issue. Accordingly, a court would not err by excluding an expert whose testimony consisted solely of providing a dressed-up and credentialed declaration of what would be already safely within a juror's common-sense understanding.

*State v. Scott*, 275 S.W.3d 395, 410 (Tenn. 2009) (internal citations omitted). It appears that the question of whether expert testimony regarding a defendant's susceptibility to making false confessions is necessary to substantially assist the trier of fact has not been directly addressed in Tennessee. Some trial courts have admitted such testimony while others have ruled that the underlying data was unreliable. *See State v. Christopher Kevan Hein*, No. E2003-01793-CCA-R3-CD, 2004 WL 1269304, at *10 (Tenn. Crim. App., at Knoxville, June 9, 2004) (concluding that trial court did not err in refusing to allow an expert to testify in rebuttal about "generalized [information] on false confessions and police interrogation

14

techniques"), *perm app. denied* (Tenn. October 11, 2004); *State v. Matthew Kirk McWhorter*, No. M2003-01132-CCA-R3-CD, 2004 WL 1936389, at *10 (Tenn. Crim. App., at Nashville, Aug. 30, 2004) (Expert testified at trial about false confessions in general and the defendant's personality traits and mental condition, and he opined that the defendant gave a false confession.), *perm app. denied* (Tenn. October 19, 2009).

Other jurisdictions have determined this issue in various ways. For example, the Supreme Court of Kansas held that a defendant may introduce expert psychological testimony "bearing on his or her ability to respond reliably to interrogation" as long as the expert offered information outside the jurors' usual human experience and did not comment on "the expert's judgment on the defendant's reliability in the specific instance of the confession submitted for the jury's consideration." *State v. Oliver*, 124 P.3d 493, 508 (Kan. 2005) *overruled on other grounds by State v. Anderson*, 197 P.3d 409 (Kan. 2008). On the other hand, an Illinois appellate court determined that a trial court did not err by excluding an expert's testimony (who happened to be the same expert involved in the case *sub judice*) after determining that his "testimony regarding his assessment of defendant's interrogative suggestibility was not beyond the common knowledge of lay persons and would not aid the trier of fact in reaching its conclusion." *People v. Bennett*, 876 N.E.2d 256, 272 (Ill. App. Ct. 2007).

In our view, the Kansas decision provides a better reasoned approach to the issue. Applying that court's reasoning to the facts of this case, we cannot say that the trial court applied an incorrect legal standard or reached a decision that was against logic or reasoning. The trial court allowed Dr. Frumkin to testify about the Defendant's particular personality traits and mental conditions that make him more susceptible to suggestion than other people, and it left to the jury the determination of the credibility of the Defendant's statements to his daughter. The jury heard testimony from other witnesses about the circumstances of the phone call, and the defense counsel cross-examined the detective about interrogation methods. We conclude that Dr. Frumkin's testimony at trial provided information for the jury beyond their experience. We further conclude that the jury could connect the expert testimony with the other testimony at trial through simple logic to reach a conclusion about the veracity of the Defendant's statements to M.H.. Therefore, the trial court did not abuse its discretion in limiting Dr. Frumkin's testimony in this manner, and the Defendant is without relief as to this issue.

## 2. Exclusion of Testimony

For his final issue, the Defendant claims that the trial court erred by excluding Dr. Frumkin's testimony regarding his analysis of deficiencies in the victim's forensic interview and the mother's questioning of the victim. He also argues that the trial court should have given Dr. Frumkin greater access to the recording of the victim's forensic interview.

15

The trial court summarized Dr. Frumkin's testimony as follows:

First, Dr. Frumkin testified regarding the forensic interview of the alleged child victim. In general, he stated that the manner in which the interviewer conducts the interview can influence the responses from the victim. In this case, he noted several "red flags" during the interview process which he would testify could influence the credibility of the victim's testimony because the child is susceptible to suggestion. He suggested the child could have been contaminated by her mother, such as if the mother yelled in front of the victim. He stated it appeared the interviewer was there to get the child to admit sexual abuse by using leading questions and multiple choice questions. He stated that writing the child's answers on an easel reinforces the statement when the statement could have been false. He noted some inconsistencies in the child's statements, including the timing of the event. Dr. Frumkin admitted he did not know the qualifications of the person conducting the interview and noted there is not a single protocol for interviewing children.

As to testimony regarding the interview techniques of the victim, the Court holds such testimony shall be excluded. . . .

. . . .

In this case, the Court finds that such testimony would not substantially assist the trier of fact and would be confusing to the jury. Tenn. R. Evid. 702, 403. First, the proffered testimony is not reliable enough to substantially assist the jury in making a finding of whether the alleged crimes have occurred. The Court finds the testimony of Dr. Frumkin regarding the interview of children is more appropriate for psychological treatment of children or for a presentation at a convention rather than for expert testimony to be given a jury. When questioned regarding his research or presentations on child susceptibility, Dr. Frumkin was only able to list a couple of conferences in which he spoke and only a few others in which the topic was addressed. Second, the testimony would invade the jury's province of fact finding and would be an indirect comment on the credibility of the witness. *State v. [Joseph] Vermeal*, No. M2004-000460CCA-R3-CD, 2005 WL [1000237] (Tenn. Crim. App.[,] Apr. 29, 2005). Although *Vermeal* does cite *State v. Coley*, 32 S.W.3d 831 (Tenn. 2000), which was later overturned by *State v. Copeland*, 226 S.W.3d 287 (Tenn. 2007)[,] the analysis of Tenn. R. Evid. 702 is still applicable and good law. *Copeland* gives much guidance and deference to trial courts in determining admissibility under Tenn. R. Evid. 702. The defendant's own supplemental memorandum discusses a purpose for Dr.

16

Frumkin's testimony would be to explain the 'effect those (interview) methods have on the accuracy of information given by the child.' The 'accuracy' of the alleged victim's statement is an issue for the jury to determine. Finally, the jurors can understand issues regarding the manner of questioning without expert guidance.

In our view, the trial court did not abuse its discretion by not allowing Dr. Frumkin to testify regarding the interview techniques used during the victim's forensic interview or the manner in which M.H. questioned the victim. While the trial court did not explicitly say so, the trial court's comments about Dr. Frumkin's own research into child susceptibility suggest that the court found that Dr. Frumkin was not qualified to be an expert in this particular field. From our review of Dr. Frumkin's proffered testimony, we cannot conclude that the trial court's determination about Dr. Frumkin's qualifications was illogical. Furthermore, the trial court's reliance on *Vermeal* was not an abuse of discretion because, as the trial court noted, the *Vermeal* court's use of *Coley* was not a fatal flaw. The *Vermeal* court analyzed the issue under Tennessee Rule of Evidence 702 and *McDaniel*, 955 S.W.2d at 265, and discussed several other cases besides *Coley*. *Vermeal*, 2005 WL 1000237, at *6. Therefore, it was not unreasonable for the trial court to follow *Vermeal*. Even if the trial court abused its discretion in this regard, we conclude that the error would be harmless because the State did not present the testimony of the person who interviewed the victim nor did it introduce the recording of the interview as evidence. Additionally, the defense thoroughly cross-examined M.H. about how she approached questioning the victim. Therefore, the Defendant is without relief as to this issue.

As for the Defendant's assertion that the trial court erred by not giving Dr. Frumkin free access to a recording of the victim's forensic interview, we conclude that the trial court properly denied the Defendant's request for a copy of the video recording. In Tennessee, all reports of child sexual abuse are confidential. *See* T.C.A. § 37-1-612. While the statute provides enumerated exceptions, "[t]hose accused of child sexual abuse are not among the exceptions to [Tennessee Code Annotated section] 37-1-612." *State v. Gibson*, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997). Additionally, Tennessee Rule of Criminal Procedure 16(a)(2) prohibits discovery and inspection of reports and other internal documents made by state agents in connection with the investigation and prosecution of the case. Tenn. R. Crim. P. 16(a)(2). Tennessee courts have repeatedly denied defendants' assertions of error when trial courts have denied motions to compel disclosure of a child's forensic interview. *See* *State v. Biggs*, 218 S.W.3d 643, 662 (Tenn. Crim. App. 2006); *State v. Timothy Joseph Simpson*, No. E2005-02364-CCA-R3CD, 2007 WL 135609, at *2-4 (Tenn. Crim. App., at Knoxville, Jan. 19, 2007), *perm. app. denied* (Tenn. May 21, 2007); *State v. Young Bok Song*, No. M2004-02885-CCA-R3-CD, 2005 WL 2978972, at *7-9 (Tenn. Crim. App., at Nashville, Nov. 4, 2005) *perm. app. denied* (Tenn. March 27, 2006). Therefore, the Defendant is not entitled to relief as to this issue.

### III. Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE